993 A.2d 1175

Jacquon Lakeem COLLINS

v.

STATE of Maryland.

No. 1938, Sept. Term, 2008.

Court of Special Appeals of Maryland.

May 5, 2010.

Bradford C. Peabody (Paul DeWolf, Public Defender, on the brief), Baltimore, for appellant.

Diane E. Keller (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, for appellee.

Panel: JAMES R. EYLER, KEHOE and CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

KEHOE, J.

Jacquon Lakeem Collins appeals his October 7, 2008, conviction by a jury in the Circuit Court for Dorchester County of attempted second degree murder, assault in the first and second degree, first degree burglary, reckless endangerment, and wearing or carrying a dangerous weapon.

Appellant presents three questions, which we have reworded [1] for purposes of this appeal:

1. Did the trial court err in refusing to grant appellant's motion to dismiss for violation of the *Hicks*[2] rule?

2. Was the appellant's right to a speedy trial violated?

3. Did the circuit err in denying appellant's motion to suppress evidence of his confession?

We answer the first two questions in the negative and conclude the third has not been preserved for appellate review. We affirm the judgment of the circuit court.

---

1. Appellant phrases the issues as follows:

 1. Did the Circuit Court err by failing to grant Mr. Collins' motion to dismiss where the State committed a Hicks violation when it nol prossed Mr. Collins' case for tactical reasons, pushing trial back to well beyond the 180-day limit?
 2. Did the Circuit Court err by denying Mr. Collins' right to a speedy trial when it failed to grant his motion to dismiss where the State nol prossed and recharged for tactical reasons?
 3. Did the Circuit Court err by failing to grant Mr. Collins' motion to suppress his confession where it was induced by a police officer's assurance that an inculpatory statement would help Mr. Collins' cause?

2. *State v. Hicks,* 285 Md. 310, 334–38, 403 A.2d 356, on motion for reconsideration, 285 Md. at 334, 403 A.2d 356 (1979) held that the provisions of the predecessor statute to MD.CODE ANN.CRIM. PRO. § 6–103 (2002) and the substantively identical provisions of the predecessor rule to Maryland Rule 4–271(a) were mandatory and further held that dismissal of the charges pending against a defendant was the sanction for a violation of the statute's mandate. The scheduling requirements of the statute and the rule are often referred to as the *"Hicks* rule" or the "180 day rule."

## Factual and Procedural Background

On September 26, 2007, appellant shot Juan Figueroa[3] (Figueroa) at Figueroa's home in Cambridge, Maryland. Appellant's version of the events is that he had gone to Figueroa's home to purchase heroin and that the two began arguing over the price. Appellant claims that Figueroa then produced a shotgun. A struggle ensued, during which the shotgun discharged, critically wounding Figueroa.

The State's version of events is that appellant broke into Figueroa's home, armed with a shotgun, and demanded money from Figueroa. Figueroa attempted to defend himself by grabbing the shotgun, but was unsuccessful. Collins then shot Figueroa.

Figueroa was first taken to Dorchester General Hospital and then "life flighted" to the Shock Trauma Center in Baltimore. On September 27, 2007, Detective Christopher Flynn, with the aid of Corporal Jose Hernandez, both with the City of Cambridge Police Department, met Figueroa in his hospital room at the Shock Trauma Center. Figueroa was awake, but unable to speak. Figueroa could not speak English. With Corporal Hernandez acting as a translator, Detective Flynn presented Figueroa with a photo array containing six photographs of possible suspects, including appellant.[4] Figueroa immediately pointed to appellant's photograph and, when asked if appellant was the one who shot him, nodded his head up and down. Charges were promptly filed against appellant.

On September 28, 2007, the Salisbury Police Department arrested appellant. Appellant was then transferred to the Cambridge Police Department for questioning, during the

---

**3.** While the record indicates that the victim's name is "Juan Vega–Figueroa," the parties refer to him as "Figueroa." In this opinion, we shall refer to the victim as "Figueroa" as well.

**4.** Detective Flynn testified that he "had information from a confidential source that [appellant] was the suspect that [the police] were searching for in reference to the shooting."

course of which he made first an oral and then a written confession to Detective Flynn.

On November 20, 2007, the State charged appellant in the District Court for Dorchester County with attempted first degree murder, first degree burglary, first degree assault, second degree assault, wearing and carrying a dangerous weapon with intent to injure, and reckless endangerment. Appellant's initial appearance was on November 27, 2007. Appellant's trial was scheduled for April 16, 2008.

On March 24, 2008, Figueroa's mother contacted the Cambridge Police Department and informed them that she had developed "leads" as to who had shot her son. Appellant's was not among the names she provided. The Cambridge Police Department informed the Dorchester County State's Attorney of this on April 14, 2008. The State promptly notified appellant's counsel. On April 16, 2008, the day of trial, the State nol prossed the charges against appellant. The transcript of the nol pros proceedings does not reflect the State's reason for nol prossing the charges.

The Cambridge Police Department investigated the information generated by Ms. Figueroa and quickly concluded that appellant had been responsible for the shooting.

On May 8, 2008, appellant was indicted by a Grand Jury for the Circuit Court for Dorchester County for attempted first degree murder, first degree burglary, first degree assault, second degree assault, wearing or carrying a dangerous weapon with intent to injure, reckless endangerment, conspiracy to commit murder, and conspiracy to commit first degree assault. Other than the addition of the two conspiracy counts, the indictment was not substantially different from the earlier statement of charges against appellant.

A pre-trial suppression hearing was held on September 18, 2008, on appellant's motions to suppress Figueroa's hospital bed identification of appellant's photograph[5] and appellant's

---

5. Appellant does not appeal the trial court's denial of his motion to suppress the identification.

confession. On October 6, 2008, the trial court heard argument on appellant's motion to dismiss for violation of his Sixth Amendment right to a speedy trial and the *Hicks* rule.[6] All of appellant's motions were denied. (We will discuss the evidence presented at the hearings later in this opinion.)

At trial, the State presented evidence, in the form of Figueroa's testimony, that appellant broke into Figueroa's home on September 26, 2007. After seeing appellant on a home surveillance system, Figueroa confronted appellant in the kitchen. Appellant was holding a shotgun and demanded money from Figueroa. Figueroa refused, grabbed for the shotgun, and was shot. The State also introduced evidence of Figueroa's identification and appellant's confession. Figueroa also testified that his assailants were wearing masks and dressed all in black.

Appellant called Corporal Hernandez to ask whether Figueroa had ever previously mentioned "anyone wearing a black mask" in connection with his shooting. Corporal Hernandez testified "no" and the defense rested.

The jury acquitted appellant of attempted first degree murder, but convicted him of attempted second degree murder, first degree burglary, assault in the first and second degree, wearing or carrying a dangerous weapon with intent to injure and reckless endangerment.[7] On October 7, 2008, appellant was sentenced to 30 years imprisonment for attempted second degree murder with a consecutive sentence of 10 years for first degree burglary.[8] Appellant filed a timely appeal.

---

**6.** The judge who presided over the nol pros proceeding also presided over the hearing on appellant's motion to dismiss. Additionally, the State was represented by the same attorney at both hearings, as was appellant.

**7.** The conspiracy counts were nol prossed at trial.

**8.** The trial court also sentenced appellant to 3 years incarceration for wearing or carrying a dangerous weapon with intent to injure (Count V), to be served concurrently with the sentence for the burglary convic-

We will discuss additional facts as necessary later in this opinion.

## Discussion

### I. Was the *Hicks* rule violated?

Criminal Procedure Article § 6–103 provides:

### § 6–103. Trial date

(a) *Requirements for setting date.*—(1) The date for trial of a criminal matter in the circuit court shall be set within 30 days after the earlier of:

(i) the appearance of counsel; or

(ii) the first appearance of the defendant before the circuit court, as provided in the Maryland Rules.

(2) The trial date may not be later than 180 days after the earlier of those events.

(b) *Change of date.*—(1) For good cause shown, the county administrative judge or a designee of the judge may grant a change of the trial date in a circuit court:

(i) on motion of a party; or

(ii) on the initiative of the circuit court.

(2) If a circuit court trial date is changed under paragraph (1) of this subsection, any subsequent changes of the trial date may only be made by the county administrative judge or that judge's designee for good cause shown.

(c) *Court rules.*—The Court of Appeals may adopt additional rules to carry out this section.

---

tion. The remaining counts were merged for purposes of sentencing as follows:

Count III: Assault in the First Degree - merged into Count I;
Count IV: Assault in the Second Degree - merged into Count III;
Count VI: Reckless Endangerment - merged into Count IV.

Appellant was given credit on Count I, attempted second degree murder, for 317 days served, which included the time he was jailed pending trial on the original charges.

The Court of Appeals adopted what is now Maryland Rule 4–271 to implement the statute. The language of Rule 4–271(a) tracks the statute. It states:

(a) **Trial date in circuit court.** (1) The date for trial in the circuit court shall be set within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant before the circuit court pursuant to Rule 4–213, and shall be not later than 180 days after the earlier of those events.... On motion of a party, or on the court's initiative, and for good cause shown, the county administrative judge or that judge's designee may grant a change of a circuit court trial date. If a circuit court trial date is changed, any subsequent changes of the trial date may be made only by the county administrative judge or that judge's designee for good cause shown.

Appellant's initial appearance was on November 27, 2007. His trial, if not for the nol pros, therefore, would have had to have been begun by May 27, 2008, in order to avoid a *Hicks* violation.[9]

Appellant contends that the State nol prossed the original charges as a tactical method for circumventing the *Hicks* rule. He asserts that the State's stated reason for nol prossing the charges, in order to explore evidence that might exculpate appellant, clearly shows that it was not ready to go to trial and needed more time to gather evidence. Appellant also argues that the nol pros had the actual effect of circumventing the *Hicks* rule as appellant's actual trial did not occur until four and one-half months after the expiration of the 180 day deadline in the original prosecution.

---

**9.** May 25, 2008, was 180 days from November 27, 2007, but since May 25, 2008 was a Sunday and May 26, 2008 was a national holiday, the State had until May 27, 2008 to try appellant. *Markham v. State,* 189 Md.App. 140, 166, 984 A.2d 262 (2009) (citing *Md. Rule* 1–203(a)(1) (when computing a period of time under the Maryland Rules or under an applicable statute, if the last day of the period "is a Saturday, Sunday, or holiday ... the period runs until the end of the next day that is not a Saturday, Sunday, or holiday")).

■ The State contends that the nol pros of the initial charges was in good faith and did not have the purpose or necessary effect of circumventing the 180–day rule.[10]

Writing for the Court of Appeals, Chief Judge Bell has identified the policy considerations underlying § 6–103 and Rule 4–271:

> [T]he statute and the rule … have two aspects. Section 6–103 and Rule 4–271 "set forth [both] a definite time requirement for the trial of criminal cases and an explicit procedure for postponing a case beyond the 180–day limit." They "codify and implement the chief legislative objective that 'there should be a prompt disposition of criminal charges in the circuit courts.' " Their intended objectives, implemented via the mechanism established by the statute and the rule, are to afford reasonably prompt trials, and eliminate excessive scheduling delays and unjustifiable postponements. Thus, "the mechanism of the *Hicks* Rule serves as a means of protecting society's interest in the efficient administration of justice. The actual or apparent benefits [that Section 6–103] and Rule 4–271 confer upon criminal defendants are purely incidental."

*State v. Price*, 385 Md. 261, 278, 868 A.2d 252 (2005) (citations omitted).

Neither the statute nor the rule expressly provides how the 180 day period is to be calculated when the State nol prosses charges against a defendant and subsequently recharges him on substantially the same charges. The Court of Appeals first considered this issue in the companion cases of *Curley v. State*, 299 Md. 449, 459–61, 474 A.2d 502 (1984) and *State v.*

---

10. The State also argues that appellant did not preserve this issue for appellate review because he did not raise a *Hicks* violation before the circuit court. Our review of the record leads us to a different conclusion.

Appellant twice filed motions related to violations of Crim. Pro. § 6–103 and Maryland Rule 4–217. While appellant's counsel did not explicitly discuss the *Hicks* issue at the hearing on the motion to dismiss, the State did, and the circuit court ruled on it. We conclude the issue is preserved for review.

*Glenn,* 299 Md. 464, 466–67, 474 A.2d 509 (1984). These decisions, and others applying their holdings in a variety of factual and procedural settings, form the "relevant universe of case law" for resolving claims that the State violated the *Hicks* rule. *Baker v. State,* 130 Md.App. 281, 285, 745 A.2d 1142 (2000).

■ For the purposes of our analysis, it is not necessary to trace the historical development of Maryland's *Hicks* rule jurisprudence. That task has been performed in, among other opinions, *State v. Huntley,* 411 Md. 288, 293–95, 300 n. 13, 983 A.2d 160 (2009), *Price,* 385 Md. at 269–78, 868 A.2d 252; *Alther v. State,* 157 Md.App. 316, 325–335, 850 A.2d 1211, *cert. denied* 383 Md. 213, 857 A.2d 1130 (2004); and *Baker,* 130 Md.App. at 286–93, 745 A.2d 1142. It is sufficient to note that, as a general rule, "when a circuit court criminal case is nol prossed, and the state later has the same charges refiled, the 180–day period for trial . . . ordinarily begins to run with the arraignment or first appearance of defense counsel under the second prosecution." *Curley,* 299 Md. at 462, 474 A.2d 502. There are two exceptions. The 180 days continues to run from the first appearance in the first prosecution if the State nol prosses the first charges with the *intent* of circumventing either the 180 day rule itself or the authority of the administrative judge to schedule criminal cases. *State v. Price,* 385 Md. at 278, 868 A.2d 252 (authority of administrative judge); [11] *Ross v. State,* 117 Md.App. 357, 370, 700 A.2d 282 (1997) (requirements of 180 day rule). The second exception to the general rule is when the nol pros of the first set of charges has the *necessary effect* of circumventing the 180 day rule. *State v. Brown,* 341 Md. 609, 617, 672 A.2d 602 (1996); *Curley,* 299 Md. at 462, 474 A.2d 502; *Glenn,* 299 Md. at 467, 474 A.2d 509; *Baker,* 130 Md.App. at 288, 745 A.2d 1142.

---

11. In *Alther,* the order in question was not a scheduling order per se but a court ruling denying a motion to consolidate. 157 Md.App. at 338, 850 A.2d 1211. *Alther* thus foreshadowed the holding of the Court of Appeals in *Price.*

■ Among these decisions, *Huntley* stands apart. In that case, the Court of Appeals addressed the scope of the holdings in *Hicks* and *Curley* and, to some extent, limited them. 411 Md. at 301–03, 983 A.2d 160. In *Huntley*, a child abuse case, trial was scheduled to begin 179 days after the defendant's first appearance. *Id.* at 291, 983 A.2d 160. A week before the scheduled trial date, the victim's family brought additional information to the State indicating that the dates of the offenses in the charging document were incorrect. *Id.* at 292, 983 A.2d 160. On the day of trial, the State moved to amend the indictment, which motion was denied when the defendant objected. The State then nol prossed the charges and re-indicted the defendant approximately three weeks later. *Id.* The circuit court granted the defendant's motion to dismiss the subsequent charges on the basis that the earlier nol pros was to " 'evade the effect of [the earlier judge's] ruling denying the motion to amend.' " *Id.* at 293, 983 A.2d 160.

The Court of Appeals [12] vacated the judgment of the circuit court and remanded the case for further proceedings. Writing for the majority of the Court, Judge Harrell stated:

> We hold that the *Curley* two-pronged exceptions test, and the concurrent *Hicks* sanction of dismissal, are inapplicable where the State's nol pros follows a denial of its motion to amend an indictment, at least where bad faith on the part of the State to delay is not shown. This Court designed the *Curley* exceptions in order to prevent the State from using its nol pros power to evade the 180–day deadline and delay trial of a defendant's case beyond 180 days. Where the State's nol pros instead is used to remedy a genuinely flawed indictment, the concerns of *Curley* are not present. The severe sanction of a *Hicks* dismissal is reserved for situations where the State seeks to circumvent the strictures of § 6–103(a) and Rule 4–271(a)(1) and *unjustifiably*

---

12. On its own initiative, the Court of Appeals issued a writ of certiorari prior to this Court's decision in the case. *State v. Huntley*, 407 Md. 275, 964 A.2d 675 (2009).

delay a defendant's trial beyond 180–days. This is not such a case on the record as it exists presently.

*Id.* at 302–03, 983 A.2d 160 (emphasis added.)

Applying these principles to the case at bar, we will first consider whether the Court of Appeals' holding in *Huntley* should be extended to include situations such as the one before us. We conclude that it should.

By its terms, *Huntley* is limited to cases where the State unsuccessfully attempts to correct a flawed indictment. *Id.* In this case, there was nothing defective about the indictment; the nol pros was the result of what the State later asserted was its doubts about the degree of appellant's involvement in the attack on Figueroa. At the hearing on the motion to dismiss the second indictment, the State offered the following explanation of the reasons for its decision to enter the nol pros:

> We don't know if this information [i.e., the information from Figueroa's mother] explains the existence of a second person or identity of a second person. We don't know at this point, because having read this the State believed that from the information contained in here that we were looking at possibly three completely different persons separate and apart from the Defendant. So from the State's point of view I don't know if I've got additional suspects, I don't know if I've got Brady[13] information here. It's certainly potentially Brady information because in the State's mind it was potentially exculpatory *if we had information that would possibly say that it's not this guy, it is somebody else.*
>
> So I instructed the police to try to run that information, and the Court probably recalls from prior hearings that we

---

**13.** An apparent reference to *Brady v. Maryland,* 373 U.S. 83, 86, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ("We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.")

have a language barrier here. Detective Flynn has to rely on a Spanish speaking officer to go with him to be able to run this information down. Ultimately he did on or about the 15th of April. And we believe that to be the 15th of April, which is the day prior to the entry of the nol pros. The day before that I believe still having not investigated this information, because we're still within approximately a two week time period, *the State committed to a nol pros for the reason that this case was not ready to present to a jury because we had this information and none of us could tell the jury what this meant because we just didn't know what it was.* So we're talking about a two week delay there which is unfortunate, but quite frankly good faith requires us to run this information down as expeditiously as possible, and that is certainly what we did.

(Emphasis added.)

At the close of the hearing, the circuit court addressed the issue of the State's motivation:

I think the overriding factor for [the State's Attorney's] office has always been to make sure justice is done and the right person is charged and the right person is convicted. And I don't believe his office believes that a conviction is the end all be all, his office, they have demonstrated to me is they want to get it right before consequences, severe consequences attach to any suspect. And I think that's what they were doing here.

\* \* \* \*

*In this case the underlying reason for the nol pros, as I see it, was that [the State's Attorney] wanted to make sure that he didn't have the wrong guy.* And that was to the benefit of the [appellant]. And then thereafter there was a fairly prompt resolution within another three weeks where they ran this thing out and found there was no validity to

the original report.[14]

(Emphasis added.)

To require the State to proceed to trial under such circumstances would be manifestly unreasonable. To be sure, the State could have requested a continuance; instead the State nol prossed the charges, which had the effect of releasing appellant from pre-trial detention. The State promptly investigated the leads suggested by Ms. Figueroa, determined that appellant was in fact criminally responsible, and re-charged him in approximately three weeks. While the nol pros did delay appellant's trial beyond 180 days, we conclude, as did the circuit court, that the delay was justifiable. As such, the "severe sanction" of dismissal of the subsequent indictment is not applicable in this situation. *Huntley*, 411 Md. at 302, 983 A.2d 160.

We would reach the same result if we applied the *Curley* test, namely, whether the nol pros had the effect of circum-

------

**14.** At oral argument before this Court, appellant's counsel argued that Ms. Figueroa had actually contacted the Cambridge Police Department on January 12, 2008. Counsel conceded that this information was not presented to the circuit court.

The record indicates that, on January 12, 2008, Figueroa's mother told Corporal Hernandez that she had heard that her son was claiming that two people were involved in the shooting. Detective Flynn and Corporal Hernandez conducted a follow-up interview with Figueroa, who told them that Collins shot him, but that there was a second person present.

In March, Figueroa's mother told the police that she had information about three people who might have shot her son or were involved in his shooting. The March information provided a possibility that appellant might not have been involved in the shooting at all, let alone have been the shooter. The State informed appellant of both the January and the March statements by the victim's mother prior to the hearing on the motion to dismiss.

At best, the January contact raises an issue as to whether the Cambridge Police Department should have more energetically investigated the matter in January, 2008. Had appellant called the motion court's attention to the matter, the State could have presented evidence on the issue and the court could have made findings regarding it. None of this occurred and we decline to speculate as to what the evidence may have indicated. Our analysis will be limited to the evidence and arguments actually presented to the motions court. Maryland Rule 8-131(a).

venting the 180 day rule or whether the nol pros was entered for the purpose of circumventing the rule. *Curley*, 299 Md. at 462, 474 A.2d 502; *Baker*, 130 Md.App. at 288, 745 A.2d 1142.

*- Necessary Effect -*

 The original charges were nol prossed on April 16, 2008. At that point, there were still 40 days left before the expiration of the 180 day period. In *Brown*, the nol pros was entered 43 days prior to the expiration of the 180 day period and the Court of Appeals noted that 43 days provided an ample opportunity for the State to obtain a postponement from the administrative judge for good cause. 341 Md. at 620, 672 A.2d 602. *See also Glenn*, 299 Md. at 467, 474 A.2d 509 (nol pros with 57 days remaining in the 180 day period). We conclude that there was good cause for a postponement in the case before us and the 40 days remaining before the expiration of the 180 day deadline was more than enough time to obtain one. While appellant points to the fact that his actual trial took place after the 180 day limit expired, the proper focus is on the possible consequences to the State if a nol pros was not entered. As Judge Moylan has explained for this Court:

> It is the teaching of *Curley, Glenn,* and *Brown* that we do not assess the situation by looking backward from the arguably adverse *effect,* searching for a cause. A mere *cause and effect* relationship is not enough. We look, rather, from a potential *cause* forward, asking not whether the feared *effect* is a predictable possibility but whether it is, *as of that moment,* already a foregone conclusion—a *necessary effect,* an unavoidable consequence, a virtual inevitability. We assess the situation as of the day the nol pros is entered.

*Baker,* 130 Md.App. at 299, 745 A.2d 1142 (emphasis in original.)

*- Purpose -*

 Finally, the nol pros was clearly not entered in order to circumvent either the 180 day rule itself, "the authority and decision of the administrative judge" in scheduling criminal

trials, *Price*, 385 Md. at 278, 868 A.2d 252, or other orders of a similar effect, *Alther*, 157 Md.App. at 338, 850 A.2d 1211. The circuit court concluded that the State's Attorney was motivated by his desire "to make sure that he didn't have the wrong guy" and the record before us gives us no basis for a contrary determination.

## II. Was the appellant's right to a speedy trial violated?

The Sixth Amendment to the United States Constitution guarantees the accused in all criminal prosecutions the right to a speedy trial. *Clark v. State*, 97 Md.App. 381, 385, 629 A.2d 1322 (1993) (quoting *Doggett v. United States*, 505 U.S. 647, 651, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992)). This fundamental right is imposed upon all states by the Fourteenth Amendment's Due Process Clause. *Clark*, 97 Md.App. at 385, 629 A.2d 1322 (quoting *Barker v. Wingo*, 407 U.S. 514, 515, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)).

Speedy trial questions are resolved through a two-step process. First, a court determines whether the amount of time between the filing of charges and the time of trial is "presumptively prejudicial" to the defendant. As Judge Cathell explained for this Court:

> A problem peculiar to the *Barker* test is its use of the terms presumption of prejudice and actual prejudice. When there has been a lengthy pretrial delay, one of constitutional dimension, then a presumption arises that the defendant has been deprived of his right to a speedy trial; a presumption of prejudice. Once this presumption asserts itself, a balancing test must be employed which involves a weighing of [the] four factors, one of which is actual prejudice. Actual prejudice involves a consideration of three interests the speedy trial right is meant to protect. Whatever importance it assumes in the final outcome is a function of the facts of the particular case. *Howell v. State*, 87 Md.App. 57, 80 [589 A.2d 90], *cert. denied*, 324 Md. 324 [597 A.2d 421]

(1991) (citing *Brady v. State,* 291 Md. 261, 266 [434 A.2d 574] (1981)).

*Clark,* 97 Md.App. at 386, 629 A.2d 1322.

■ If we conclude that threshold test has been met, we then weigh four factors: the " '[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.' " *Clark,* 97 Md.App. at 385, 629 A.2d 1322 (quoting *Barker,* 407 U.S. at 530, 92 S.Ct. 2182). The length of delay thus performs two roles: first, it may trigger a constitutional analysis and, second, it is a factor employed in the constitutional analysis determining whether the defendant's speedy trial rights were violated. *Glover v. State,* 368 Md. 211, 223, 792 A.2d 1160 (2002).

■ When reviewing a circuit court's decision regarding a motion to dismiss on speedy trial grounds, an appellate court makes its own, independent constitutional appraisal. *Glover,* 368 Md. at 220, 792 A.2d 1160 (citing *State v. Bailey,* 319 Md. 392, 415, 572 A.2d 544, *cert. denied,* 498 U.S. 841, 111 S.Ct. 118, 112 L.Ed.2d 87 (1990)). In so doing, we accept the circuit court's factual findings unless clearly erroneous. *Glover,* 368 Md. at 221, 792 A.2d 1160 (citing *Rowe v. State,* 363 Md. 424, 432, 769 A.2d 879 (2001)). We will not deem a circuit court's findings to be clearly erroneous if there exists any competent evidence to support those findings. *Goff v. State,* 387 Md. 327, 337, 875 A.2d 132 (2005) (quoting *Solomon v. Solomon,* 383 Md. 176, 202, 857 A.2d 1109 (2004), in turn quoting *Fuge v. Fuge,* 146 Md.App. 142, 180, 806 A.2d 716 (2002)).

We now turn to the facts of the case before us.

Appellant asserts that the length of delay was ten months and two weeks, commencing November 21, 2007 to the first day of his trial, October 7, 2008.[15] He states that a delay of that duration evidences that appellant suffered a presumptively prejudicial delay. As such, appellant argues that the bur-

---

**15.** As the State points out in its brief, appellant was taken into custody on September 28, 2007.

den of proving that the delay was not of constitutional dimension shifts to the State. The State argues that the delay was only five months, but, regardless, argues that even a delay of ten months and two weeks is not a delay of constitutional dimension.

■■■■■ The first step of the speedy trial analysis is to determine whether the length of pre-trial delay was "presumptively prejudicial," i.e. of sufficient duration to trigger further analysis under the Speedy Trial Clause. The first part of the first step is to determine when the speedy trial calendar began to run.

In *United States v. MacDonald,* 456 U.S. 1, 7, 102 S.Ct. 1497, 71 L.Ed.2d 696 (1982), the Supreme Court held that "the Speedy Trial Clause has no application after the Government, acting in good faith, formally drops charges. Any undue delay after charges are dismissed, like any delay before charges are filed, must be scrutinized under the Due Process Clause, not the Speedy Trial Clause." *See also Clark,* 97 Md.App. at 388, 629 A.2d 1322. As we have noted, the trial court found that the State's Attorney was acting in good faith when he dismissed the original charges. Our independent review of the record leads us to the same conclusion.

The speedy trial calendar, therefore, began to run on May 8, 2008, the day the second indictment was issued. Appellant's trial was held five months later on October 7, 2008.

■■■■ Next, we must assess whether, under the circumstances of the case, the delay is of constitutional dimension, that is, whether the delay has been long enough to establish a presumption of prejudice to the defendant. If we determine that it is not, our speedy trial analysis ends. *Barker,* 407 U.S. at 530–31, 92 S.Ct. 2182 ("Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance. Nevertheless, because of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case.")

Appellant was indicted on May 8, 2008. He was arrested on June 12, 2008, and arraigned on the same day. Slightly more than a month elapsed between the time of the second indictment and appellant's second arrest. The record does not disclose the reason for the delay in arresting appellant. Appellant does not suggest, however, that the State deliberately delayed arresting him and we can conceive of no reason why the State would do so. A scheduling conference was held on July 7, 2008, at which time a two day jury trial was scheduled for October 7 and 8, 2008. There is no indication, and appellant does not argue, that the delay between his arrest on June 12 and the commencement of his trial on October 7 was the result of anything other than normal court administration.

The delay of five months, under the circumstances of this case, is not of constitutional dimension. *Isaacs v. State*, 31 Md.App. 604, 614, 358 A.2d 273 (1976) (delay of five months and six days is not of constitutional dimension); *State v. Hunter*, 16 Md.App. 306, 315, 295 A.2d 779 (1972) (delay of five and one half months is not of constitutional dimension).

Because we have determined that the delay is not of constitutional dimension, our speedy trial analysis ends. *Barker*, 407 U.S. at 530–31, 92 S.Ct. 2182; *Flores v. State*, 120 Md. App. 171, 194, 706 A.2d 628 (1998) (citing *Barker*).

### III. Did the circuit court err in denying the motion to suppress?

When reviewing the denial of a motion to suppress, this Court looks solely at the record of the suppression hearing, extending great deference to the factual findings of the suppression judge with respect to determinations regarding witness credibility and the weighing of first-level facts. *Cooper v. State*, 163 Md.App. 70, 84, 877 A.2d 1095 (2005) (citing *Alston v. State*, 159 Md.App. 253, 261–62, 858 A.2d 1100 (2004)). Such determinations will not be disturbed unless clearly erroneous. *Cooper*, 163 Md.App. at 84, 877 A.2d 1095 (citing *State v. Rucker*, 374 Md. 199, 207, 821 A.2d 439 (2003)). All facts must be viewed in the light most favorable to the prevailing party on the motion. *Id.*

Although great deference is given to the trial court in relation to its factual findings, we perform "our own independent constitutional appraisal of the law as it applies to the facts of the case." *Cooper,* 163 Md.App. at 84, 877 A.2d 1095 (citing *Alston,* 159 Md.App. at 261–62, 858 A.2d 1100).

Appellant argues that Detective Flynn improperly induced appellant's confession by promising that an inculpatory statement would help appellant's cause. The State responds that appellant did not raise this ground to the court at the motions hearing and that appellant's contention is accordingly not preserved for appellate review. We agree.

At the suppression hearing, Detective Flynn, the officer who interrogated appellant, testified in pertinent part:

[PROSECUTOR]: Did you have occasion to ask [appellant] if he was willing to speak with you?

[DETECTIVE FLYNN]: Yes, I did.

[PROSECUTOR]: And how did you ask him that?

[DETECTIVE FLYNN]: I asked him if there was anything he wanted to tell me as far as the incident on Charles Street. Told him that [appellant] or the victim was in critical condition at that point. Any information that he can give us may help his cause as far as explaining how the whole situation happened.

\* \* \* \*

[PROSECUTOR]: What did you mean when you said that you told him it may help his cause?

[DETECTIVE FLYNN]: I told him that there were two sides to every story and right now we only have one side of that story. I asked him if he could explain how this incident unfolded, which he eventually did.

On cross-examination, the following colloquy occurred:

[APPELLANT'S COUNSEL]: You asked him if there's anything he wants to tell you?

[DETECTIVE FLYNN]: After I asked him if he understood his rights, yes.

[APPELLANT'S COUNSEL]: Okay. Because it might help his cause.

[DETECTIVE FLYNN]: I think my words to him were at that point we only had one side of the story and I needed to find out what his side of that was. And I think that in general terms that may have been something I mentioned to him, yes.

At the conclusion of the hearing, appellant's counsel then argued to the suppression court:

[C]ertainly pursuant to [*Tague v. Louisiana,* 444 U.S. 469, 470–71, 100 S.Ct. 652, 62 L.Ed.2d 622 (1980)], which is a 1980 case, it states within that opinion that in [*Miranda v. Arizona,* 384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)] that case clearly states principles once warnings have been given, and certainly this matter falls within those perimeters. If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden is the language used within the case, and that heavy burden rests on the government to demonstrate that [appellant] knowingly and intelligently waived his privilege against self-incrimination and to retain or appoint counsel.

Certainly the United State Supreme Court has always set high standards for proof of waiver of these constitutional rights and [*Tague v. Louisiana*] reasserted these rights. In quoting from the language of the case, "since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborating evidence of warnings, the burden rightly rests within the State's shoulders." [*Tague v. Louisiana,* 444 U.S. 469, 470–71, 100 S.Ct. 652, 62 L.Ed.2d 622 (1980)] And it would be the defense's position that the State has not met that burden.

The suppression court ruled on the admissibility of appellant's statement as follows

With respect to the statement given, it seems though there's no contest here, it was a custodial interrogation, he was under arrest. He was in a standard interview room, there

were no armed persons in there. There's no information before the Court that he was denied any liquids or food or the ability to go to the bathroom, anything like that, there's nothing before the Court regarding that.

\* \* \* \*

I find that the [appellant] was in full possession of his faculties that day and that there is nothing given the totality of the circumstances that indicate this was not a voluntary confession and the motion to suppress the statement is denied.

 It is clear from the transcript of the suppression hearing that appellant did not raise the issue of improper inducement as a basis for suppressing the confession nor did the circuit court rule upon improper inducement. "[T]he failure to argue a specific theory in support of a motion to suppress evidence constitutes waiver of that argument on appeal." *Reynolds v. State,* 327 Md. 494, 502–03, 610 A.2d 782 (1992); *Evans v. State,* 174 Md.App. 549, 557, 922 A.2d 620 (2007) (citing *Johnson v. State,* 138 Md.App. 539, 560, 772 A.2d 1260 (2001)); *Brashear v. State,* 90 Md.App. 709, 720, 603 A.2d 901 (1992)). Because the issue is not preserved for appellate review, we will not consider it. *See* Rule 8–131(a) ("Ordinarily, the appellate court will not decide any . . . issue [other than jurisdiction] unless it plainly appears by the record to have been raised in or decided by the trial court. . . ."); *Fitzgerald v. State,* 384 Md. 484, 505, 864 A.2d 1006 (2004); *Taylor v. State,* 381 Md. 602, 612, 851 A.2d 551 (2004); *Conyers v. State,* 354 Md. 132, 148, 729 A.2d 910, *cert. denied,* 528 U.S. 910, 120 S.Ct. 258, 145 L.Ed.2d 216 (1999).

**THE JUDGMENTS OF THE CIRCUIT COURT FOR DORCHESTER COUNTY ARE AFFIRMED. COSTS TO BE PAID BY APPELLANT.**