REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 912

September Term, 2012

ROBERT ARMSTRONG WHITE

v.

STATE OF MARYLAND

Meredith,
Graeff,
Leahy,

JJ.

Opinion by Leahy, J.

Filed: April 28, 2015

Science and technology play a vital role in the criminal justice system, especially in cold cases, by, for example, exonerating the innocent and identifying the guilty through advances such as forensic DNA testing. But technology can also trample important constitutional protections, as demonstrated by the incessant struggle to protect privacy rights. Technical innovations must, therefore, satisfy the perennial dictates of the United States and Maryland Constitutions before they may be utilized in a criminal case. In this appeal, we examine, among other things, whether use in the courtroom of a two-way video conference in lieu of physical, in-court testimony by one of the State's forensic technicians violated Appellant Robert Armstrong White's constitutional right to confrontation.

Two women—T.K. and E.L[1]—were raped during separate incidents in Montgomery County, Maryland in 1979. Despite the investigations launched in each case, their assailant was never identified. Approximately three decades later, the Montgomery County Police Department reopened these cold cases and sent the forensic evidence collected in each case to the lab for DNA testing—an investigative tool not available in the 1970s.[2] Those DNA analyses ultimately revealed a match with Appellant's DNA. Consequently, in the spring of 2012, Appellant was separately tried for each case before two different judges in the Circuit Court for Montgomery County.

---

[1]     We use the victims' initials in order to protect their privacy.

[2]     Modern DNA testing was first used in criminal investigations in the 1980s. *See Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 62 (2009).

At trial, the State presented the testimony of Jeanne Hostetler, the serologist who examined the original rape kits in each case, via two-way video conference. The juries in each case ultimately convicted Appellant of the first-degree rapes, as well as other related offenses. In his timely appeal,[3] Appellant presents three questions for our review, which we have reordered:

I. Did the trial court err in denying Appellant's motion to dismiss based on Appellant's right to a speedy trial?

II. Did the trial courts err in admitting testimony via video conference in violation of Appellant's confrontation rights?

III. Did the trial court err in allowing the State to make improper and prejudicial statements at closing argument?

We hold that the circuit court properly denied Appellant's motion to dismiss filed in the second trial because Appellant's right to a speedy trial was not violated. Specifically, we conclude that, under the good faith standard applied to the government's dismissal of charges announced in *United States v. MacDonald*, 456 U.S. 1 (1982), the speedy-trial clock did not begin to run in this case until the filing of the second statement of charges and detainer, and the resulting delay did not impair Appellant's right to a speedy trial. We also hold that after conducting a fact-sensitive inquiry, the circuit court did not err in finding Ms. Hostetler unavailable to testify at trial, and correctly determined

---

[3] The charges as to both victims were contained in the same indictment, and both trials shared the same case docket number and record in the circuit court; therefore, Appellant appealed both trials jointly. *See* Md. Rule 8-421 ("All appeals on the same record, whether in the same action or in two or more actions consolidated in the lower court, shall be docketed as one action on appeal.").

that under the circumstances, admission of her testimony via two-way video conference subject to full cross-examination in lieu of physical, in-court testimony did not violate Appellant's constitutional right to confrontation pursuant to the principles espoused in *Maryland v. Craig*, 497 U.S. 836 (1990). Appellant failed to preserve his argument that the State made improper and prejudicial arguments during closing, and we conclude that the prosecutor's statements did not deny Appellant his fundamental right to a fair trial as to warrant plain error review. Accordingly, we affirm the judgments of the trial courts.

## BACKGROUND

In 2009, the Montgomery County Police Department re-opened two cold cases involving the 1979 rapes of T.K. and E.L. The DNA of the semen samples taken from each case was run through the Combined DNA Index System and revealed a match to Appellant's DNA.[4] The State then obtained a search warrant for the buccal swab of Appellant, and additional testing of the buccal swab with the samples taken from each cold case confirmed the DNA match.[5] In T.K.'s case, Appellant was charged with two

---

[4]    Following a motion to preclude filed by Appellant, the State agreed not to mention at trial that Appellant's DNA profile was in the Combined DNA Index System ("CODIS"), a database maintained by the Federal Bureau of Investigation for the "storage and exchange of DNA records submitted by federal, state, and local forensic DNA laboratories." Md. Code (2003, 2011 Repl. Vol.), Public Safety Article ("PS") § 2-501(b)(1). The Public Safety Article requires submission of DNA samples from individuals who are convicted of a felony or a violation of § 6-205 or § 6-206 of the Criminal Law Article and from those charged with a crime of violence or burglary or an attempt to commit a crime of violence or burglary. PS § 2-504(a)(1), (3).

[5]    Pursuant to PS § 2-510, "[a] match obtained between an evidence sample and a (continued . . . )

3

counts of first-degree rape, two counts of second-degree rape, and robbery with a dangerous weapon. In E.L.'s case, Appellant was charged with two counts of first-degree rape, two counts of second-degree rape, first-degree sexual offense, and kidnapping.[6] Although the crimes relating to each victim were charged in the same indictment, Appellant requested, and the State ultimately agreed, that each case be tried separately.

A. Trial One—March 19-22, 2012—Judge McCormick Presiding

T.K. testified that in March of 1979, she was twenty years old, working at the National Bureau of Standards and at the Montgomery Ward, and attending a night class at Montgomery College in Rockville, Maryland. On March 12th, after her class ended at 8:30 p.m., she left the building and started walking toward her car in the parking lot. Suddenly a man grabbed her from behind and placed his arm across her mouth. He stuck a sharp object, which she thought was a knife, against her neck. The man told her not to make any noise and dragged her into the cover of nearby pine trees. The man made T.K. pull her pants down and forced her to engage in vaginal intercourse. He made her wear a sweater over her head so she could not see. After making her pull her pants up again, he dragged her to another location, still holding the sharp object to her neck. Again he forced her to pull her pants down, got on top of her, and repeated the rape. T.K. testified

_____

data base entry may only be used as probable cause and is not admissible at trial unless confirmed by additional testing."

[6] The indictment also charged Appellant with the 1984 first-degree rape of another victim, L.M., but these charges did not proceed to trial.

4

that she was a virgin, that she was scared, and that when she whimpered, he admonished her to be quiet. She related that she thought he was going to cut her neck and that she was probably going to die.

The man then made T.K. hand over a pack of cigarettes and her wallet, containing checks and $3.00. As he smoked a cigarette, and while holding her checkbook and driver's license, he asked her to affirm her address and that her name was T.K. He threatened her, stating, "if you tell anybody about this . . . . I will go back to this house . . . and fire up the house and burn everybody in it." Next he threw her car keys. After retrieving them, T.K. got into her car and drove to her parents' house where she lived. Her mother called the police.

When the police officer arrived, T.K. told him what had happened and provided a description of her assailant, although she admitted that she was unable to get a good look at him. She told the officer that the man had been masked, but could not remember other details. Once she arrived at Suburban Hospital, she met with a female officer and received a pelvic exam performed by a doctor.

Thomas Schirf, who at the time of trial was retired from the Montgomery County police force, testified that he was the primary detective involved in T.K.'s case. After refreshing his recollection by referring to a report that he prepared during the investigation, Detective Schirf testified that he received a phone call at around 11:15 p.m. regarding a rape on March 12, 1979, and that he drove over to T.K.'s home. T.K. described her attacker as a "Negro male, age unknown, 5'8", medium build, wearing a

green Army field jacket, white knit hat pulled over face, white gloves or hands wrapped with a white cloth." Detective Schirf collected T.K.'s clothing for evidence. Then T.K. accompanied Detective Schirf to the crime scene, where she pointed out the pine trees and wooded area and recounted what had occurred. Immediately thereafter, Detective Schirf took T.K. to Suburban Hospital, where a doctor conducted a pelvic exam and collected samples for a rape collection kit in the presence of female officer, Sheila Rahn. After the evidence was gathered, Detective Schirf placed the evidence into sealed bags that ultimately went to the crime lab in a sealed box. He then gave the box to Detective Gibson, who delivered the box to Jeanne Hostetler, a serologist.

Sheila Feeney (maiden name Rahn), a retired Montgomery County police officer, testified that she witnessed T.K.'s pelvic exam and the doctor's collection of swabbings for T.K.'s rape kit. She obtained the samples and swabs from the doctor conducting the exam and placed them back into the kit.

Jeanne Hostetler then testified—via video conference—that she was a forensic serologist for the Montgomery County Police Department in 1979.[7] She received the box of evidence in T.K.'s case in sealed condition and opened the box to conduct a serological analysis of the items therein. To conduct this analysis, she cut small portions of the swabbings for her examination and replaced the remaining portions into the

---

[7] In Section II of the Discussion, *infra,* we review the hearings conducted by the court to address Ms. Hostetler's availability and the feasibility of employing two-way video conferencing.

6

original containers. After her examination, she placed the containers back into the box, sealed it, and returned the box to another detective. T.K.'s assailant could not be identified during the initial investigation.

Detective Joe Mudano, a detective in Montgomery County Police Department's Cold Case Unit, testified that in May 2009, he reopened the investigation into T.K.'s rape. Detective Mudano began his investigation by collecting all of the materials from the original investigation, including the crime scene photographs and the old police files from the County's Archives. He also obtained the original evidence box from the secured Evidence Storage Facility. The box was closed, and the tape on the box was "kind of ragged," but "still intact with the initials of who sealed it in all respects, top and bottom." It contained the victim's clothing from the night of the rape, and the forensic evidence obtained by the hospital, including vaginal and cervical swabs. Detective Mudano took the vaginal and cervical swabs, without opening the glass tubing or touching the swabs, and placed them into a sealed evidence bag, which he brought to Bode Technology, a private company that performed DNA testing for the County. He then obtained a buccal swab—a Q-tip swab from the inside of a person's cheek—from T.K.

After the initial DNA test results came back, Detective Mudano obtained a search warrant to obtain a buccal swab from Appellant. Detective Mudano testified that upon executing that warrant, Appellant responded that "it was not in his best interest to cooperate or comply with the warrant to provide us a sample." Appellant did, however, ultimately comply.

The State then called several Bode Technology analysts who assisted in the process for DNA analysis in T.K.'s case, including the cutting, extraction, amplification, and sequencing of the buccal and cervical swab samples.[8] Amy Baldwin, a forensic DNA analyst at Bode Technology Group, testified that the DNA analysis indicated that Appellant's DNA profile matched one of the DNA profiles extracted from the cervical swab from T.K. She testified that "[t]he probability of randomly selecting an unrelated individual with th[e] DNA profile [in TK's case] at 15 of the 15 areas tested is about 1 in 190 septillion in the U.S. Caucasian population, 1 in 1.2 septillion in the U.S. African-American population and 1 in 50 septillion in the U.S. Hispanic population." Barry Segelken, an employee with the Motor Vehicle Administration, testified confirming Appellant's address in 1979—a location demonstrated to be only five miles away from Montgomery College

On March 23, 2012, the jury convicted Appellant of two first-degree rapes of T.K. and robbery, but acquitted Appellant of robbery with a dangerous weapon.

B. Trial Two—April 10-13, 2012—Judge Greenberg Presiding

E.L., twenty-two years old in November 1979, testified that on November 16,

---

[8] Amy Jeanguenat testified about her work relating to the cutting, extraction, amplification, and sequencing of the victim's buccal swab and the cutting and extraction of the cervical swab; Amy Snyder testified about her work relating to the amplification and sequencing of the cervical swab; and Shannon Weitz testified about her work relating to the cutting of Appellant's buccal swab. Ms. Baldwin was also involved with the DNA analysis of Appellant's buccal swab, specifically the extraction, amplification, and sequencing.

1979, she went to Walter Johnson High School to attend her younger brother's band performance. She pulled into the parking lot, and as she was turning her car off, her door suddenly flung open, and a man shoved her down and said, "Don't look at me. Keep your head down." After telling someone nearby to "get out of here," he got into the car and began to drive away from the school. When the car came to a stop, the man directed E.L. to take her clothes off. E.L. briefly felt a cold piece of metal on her left side and thought it could have been a knife. The man instructed her not to look at him or she would "get it" and made her wrap her shirt around her head so she could not see him. He then "forced intercourse." Next he made E.L. engage in fellatio, threatening her to "do it nicely and you won't get hurt." He then instructed her to lay face down and again forced vaginal intercourse on her.

The man then drove E.L. back to the school and stopped the car. He said, "I'm going to leave you here now and don't look up or you're going to get it and everyone is going to get it . . . count to 50 and then you can get up." After he left, E.L. was afraid to move, but slowly dressed herself, went into the school, and went directly to a police officer to tell him she had been raped. She was then taken to Suburban Hospital, where she received a pelvic exam in the presence of a female officer. She remembered swabbings and her clothing being taken.

Catherine Stavely, a retired Montgomery County police officer at the time of trial, testified that she responded to the hospital on November 16, 1979 to investigate the rape of E.L. While there, she interviewed E.L. and obtained a statement about what had

9

happened, which was recorded in her report and read aloud to the jury. She stated that she was unable to identify the suspect because E.L. only got a brief look at the suspect and that the fingerprint processing did not successfully reveal any latent prints. She was also present during the pelvic examination conducted at the hospital and witnessed the collection of swabbings and samples for the rape kit. She then put the items into the rape kit bag, sealed it, and delivered the bag to Jeanne Hostetler for serology testing.

Jeanne Hostetler testified via video conference that in 1979, she worked as a serologist at the Montgomery County Police Department. She received E.L.'s rape kit from Ms. Stavely and conducted an analysis of the items. This required her to take small cuttings from the swabs/clothing and then place them back into the containers in sealed condition. She then placed the containers back in to the evidence box and sealed it. Appellant's counsel cross-examined Ms. Hostetler about the items of clothing she examined. She agreed that she was unable to identify a suspect from her testing.

Detective Mudano, a detective in Montgomery County Police Department's Cold Case Unit, testified that in late 2009 or January 2010, he reopened the 1979 rape of E.L. He began by collecting the original evidence bag, including the rape kit, from the County's evidence storage facility. No clothing was located, although he had knowledge that E.L.'s clothing had been taken into custody. The bag was intact, taped, and sealed, bearing, among other things, the victim's name. The items therein were then transferred to another bag and resealed. Detective Mudano clarified that he only transferred the cervical and saliva swabbings from the rape kit, and did not fully open them. He then

10

hand-carried the evidence bag to Bode Technology for DNA testing. He also obtained the original photos taken at the scene and all police reports.

Again, after learning that there was a male DNA profile obtained from the cervical swabbing in E.L.'s rape kit, Detective Mudano obtained a search warrant to obtain a buccal swab from Appellant.[9] Upon being served with the warrant, Appellant responded that "he did not think it was in his best interest to comply with the warrant." However, Appellant ultimately complied, and the sample was thereafter brought to Bode Technology for testing.

As in the prior trial, the State called several Bode Technology DNA analysts who assisted in the process for DNA analysis in E.L.'s case.[10] Julie Ferragut, a senior DNA analyst at Bode Technology qualified as an expert in the field of forensic DNA analysis, testified that she reviewed the work of the other analysts and produced a final report. She opined that the DNA profile extracted from the sperm fraction of the cervical swabbing

_____

[9] It appears from the record that the search warrant for the buccal swab was sought after the State learned that Appellant's DNA in the CODIS database matched the DNA samples in *both* cases, although the jury was not apprised of this information.

[10] Shannon Weitz testified about her work relating to the cutting of Appellant's buccal swab and sending the evidence to Amy Baldwin for further testing. Ms. Baldwin testified that she extracted, amplified, and sequenced the sample of Appellant's buccal swab. Andrea Borchardt-Gardner testified about her work in cutting E.L.'s cervical swabbings and engaging in the extraction process, which split the sample into two (sperm fraction and a non-sperm fraction). This sample then went to Julie Ferragut. Ms. Borchardt-Gardner also took a cutting and engaged in the extraction process with regard to a saliva sample. This sample also went to Julie Ferragut. Ms. Ferragut testified about her work relating to the amplification of the saliva and cervical swabs, and that she "loaded" the trays for them and "generated the DNA profiles from those samples."

matched the DNA profile obtained from Appellant's buccal swab. She testified that the "probability of randomly selecting an unrelated individual with this DNA profile at 11, at 15 lo[c]i is 1 in 500 trillion in the U.S. Caucasian population; 1 in 66 trillion in the U.S. African American population; and 1 in 150 trillion in the U.S. Hispanic population." Again, Barry Segelken from the Motor Vehicle Administration testified that Appellant's address in 1979 was five miles away from the school.

On April 13, 2012, the jury found Appellant guilty of two counts of first-degree rape of E.L., first-degree sexual offense, and kidnapping.

C. Sentencing

On May 30, 2012, in T.K.'s case, Judge McCormick imposed two consecutive sentences of life imprisonment for the first-degree rapes to run consecutively to any sentence Appellant was currently serving,[11] and consecutive sentence of 10 years for robbery. The second-degree rape offenses merged. That same day, in E.L.'s case, Judge Greenberg imposed two consecutive sentences of life imprisonments for first-degree rape, a consecutive sentence of life imprisonment for first-degree sexual offense, and a consecutive sentence of 30 years for kidnapping. All sentences were to run consecutive to any previously imposed sentence. Appellant filed an appeal of both convictions and sentences on June 4, 2012.

Additional facts are presented as they pertain the issues addressed in the

---

[11]     At the time, Appellant was serving a sentence for another conviction.

discussion.

## DISCUSSION

## I.

### *Constitutional and Statutory Speedy Trial Rights*

Appellant contends the circuit court erred in denying his motion to dismiss for the State's failure to timely bring his case to trial in violation of (1) the Intrastate Detainer Act ("IDA"), 1999 Laws of Maryland, ch. 54 (H.B. 11) (codified at Maryland Code (1999, 2008 Repl. Vol.), Correctional Services Article ("CS") §§ 8-501 to -503); (2) Maryland Rule 4-271 (commonly known as the *Hicks*[12] rule); and (3) his constitutional right to a speedy trial. Appellant's motion to dismiss, filed on April 4, 2012, challenged only the timeliness of his second trial; therefore, only the timeliness of trial two before Judge Greenberg is preserved for our review.

The State initially obtained a district court statement of charges on November 23, 2010. A warrant was issued. Appellant was incarcerated at the time of the charges, so the warrant automatically converted into a detainer. But Appellant was never served with the arrest warrant because the State entered a *nolle prosequi* ("nol pros")[13] on April 15,

---

[12]     *State v. Hicks*, 285 Md. 310, 318 (1979).

[13]     "A nolle prosequi, or nol pros, is an action taken by the State to dismiss pending charges when it determines that it does not intend to prosecute the defendant under a particular indictment." *State v. Huntley*, 411 Md. 288, 291 n.4 (2009) (citing *Ward v. State,* 290 Md. 76, 83 (1981)).

13

2011, claiming that due to the unavailability of a witness, the State could not go forward with the case. Appellant disputes the State's ground for entering the nol pros contending instead, that the State filed the nol pros to circumvent the *Hicks* rule. The State obtained a new statement of charges, warrant, and detainer on July 22, 2011.

The undisputed operative dates for our analysis include the following:

- November 23, 2010: The district court issued a statement of charges and an arrest warrant/detainer, because Appellant was serving a sentence on an unrelated conviction at the time.[14]

- February 1, 2011: The State received Appellant's request for disposition under the IDA.

- April 15, 2011: The State entered a nolle prosequi, or "nol pros" as to the statement of charges.

- April 19, 2011: The arrest warrant/detainer was recalled.

- July 22, 2011: The district court issued a statement of charges (relating to the same charges) and an arrest warrant/detainer.

- August 31, 2011: The arrest warrant was served on Appellant, and Appellant appeared before the district court.

- September 29, 2011: The State filed an indictment in the circuit court.

With these dates in mind, we turn to each of Appellant's three arguments.

A. The Intrastate Detainer Act

---

[14] A detainer is "a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction." *State v. Jefferson*, 319 Md. 674, 678 n.2 (1990) (internal quotation marks and citations omitted).

14

We quickly dispose of Appellant's argument that the circuit court erred in concluding the IDA was not violated. Under this Act, "[a]n inmate shall be brought to trial within 120 days after the inmate has delivered a written request for a final disposition of the indictment, information, warrant, or complaint" to the State's attorney and the appropriate court. CS § 8-502(b). If an action is not brought to trial within 120 days, "the untried indictment, information, warrant, or complaint has no further force or effect" and "the court, on request of the inmate or the inmate's counsel, shall enter an order dismissing the untried indictment, information, warrant, or complaint **without** prejudice." CS § 8-503(e) (emphasis added).

The circuit court found that the State did not violate the IDA because the State received Appellant's request for disposition on February 1, 2011 and, within the required 120-day timeframe, disposed of Appellant's case by nol prossing the charges. We agree. Appellant did not file a request for disposition for the second detainer filed against him on July 22, 2011. Therefore, the only detainer at issue is the first detainer filed on November 23, 2010. As to the first detainer, Appellant properly requested final disposition under the IDA, and the State received this request on February 1, 2011. The State thereafter entered a nol pros for the November 23, 2010, charges on April 15, 2011, and the detainer was revoked on April 19, 2011. Based on these facts, the detainer was "disposed of" within 120 days of Appellant's request. Even if the State had filed the nol pros after 120 days, the relief that would have been afforded for such a violation was already provided: a dismissal *without* prejudice. *See Gilmer v. State*, 389 Md. 656, 670

15

(2005) ("Obviously the type of nolle prosequi which does not bar future prosecution under another charging document has the same effect as a dismissal without prejudice." (quoting *State v. Morgan*, 33 Md. 44, 46 (1870))).

B. Hicks/*Rule 4-271*

Next, Appellant charges that the State entered the nol pros of the district court statement of charges in bad faith and with the intention of circumventing *Hicks,* Maryland Rule 4-271(a)(1), and Maryland Code (2001, 2008 Repl. Vol.), Criminal Procedure Article ("CP") § 6-103. Section 6-103 and Rule 4-271(a) require the State to bring criminal cases to trial within 180 days of a defendant's first appearance in the *circuit court*.[15] *See also Hicks*, *supra,* 285 Md. at 318 (establishing the sanction of dismissal for noncompliance, absent certain exceptions).

We need not decide whether the State's dismissal of the initial district court statement of charges violated *Hicks* because based on the plain language of Rule 4-271, only proceedings in the *circuit court*—not the district court—trigger the 180-day clock. *Scott v. State*, 49 Md. App. 70, 86 (1981) (holding that the 180-requirement applies to circuit court, not district court, proceedings); *see also State v. Farinholt*, 54 Md. App. 124, 130 (1983) ("The rule is inapplicable to delays occurring in the district court." (citing *Scott*, 49 Md. App. at 86))), *aff'd*, 299 Md. 32 (1984). Here, Appellant's first

---

[15]    Maryland Rule 4-271(a) provides that "[t]he date for trial in the circuit court shall be set within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant before the circuit court pursuant to Rule 4-213, and shall be not later than 180 days after the earlier of those events."

appearance before the *circuit court* was on October 21, 2011;[16] therefore, in order to comply with Rule 4-271, Appellant's trial had to begin by April 18, 2012. Appellant's second trial for the rape of E.L. began on April 10, 2012.[17] Thus, *Hicks* was not violated.

Although the circuit court was not required to engage in the analysis, it found that the State acted in good faith when entering the nol pros of the district court statement of charges and did not intend to circumvent *Hicks*.[18] The court observed that the case was 30 years old; that, at the time of the nol pros, a presumed necessary witness was unavailable for an unknown period of time; and that, from among various options, the State chose not to pursue the charges until the witness could be available. The court also found that the nol pros did not have the necessary *effect* of circumventing *Hicks* because

---

[16] Appellant does not identify, and we cannot ascertain from the record, when Appellant's counsel formally entered his appearance.

[17] Appellant's first trial began on March 19, 2012, well within the 180-day limit.

[18] In the context of *Hicks*, ordinarily the 180-day period begins to run anew after the refiling of charges. *Curley v. State*, 299 Md. 449, 459 (1984). However, if it is "shown that [a] nol pros [of the first indictment] had the purpose or the effect of circumventing . . . [the *Hicks* time requirement], the 180-day period will commence to run with the arraignment or first appearance of counsel under the first prosecution." *Id.* at 462. For example, the State cannot nol pros the first indictment when a circuit court denies a postponement request, because it may have the purpose or effect of avoiding the 180-day time requirement. *See, e.g.*, *Wheeler v. State*, 165 Md. App. 210, 232 (2005) (postponement sought to complete DNA analysis); *Ross v. State*, 117 Md. App. 357, 370-71 (1997) (postponement sought to complete drug analysis). If, however, the nol pros was necessary because there was a defect in the indictment that precluded the State from trying a defendant on the charging document (i.e. incorrect dates), *or there is no bad faith or evidenced motive to delay trial*, the nol pros is not considered an attempt to circumvent *Hicks*. *Huntley*, 411 Md. at 299; *see also Jules v. State*, 171 Md. App. 458 (2006).

17

it did not "evade" a denial of a motion for continuance.

C. Constitutional Right to a Speedy Trial

Last, Appellant contends that the circuit court erred in concluding that his constitutional right to a speedy trial was not violated.[19] When reviewing a circuit court's judgment on a motion to dismiss claiming deprivation of the right to a speedy trial, "we make our own independent constitutional analysis." *Glover v. State*, 368 Md. 211, 220 (2002) (citing *State v. Bailey*, 319 Md. 392, 415, *cert. denied,* 498 U.S. 841 (1990)). "We perform a *de novo* constitutional appraisal in light of the particular facts of the case at hand; in so doing, we accept a lower court's findings of fact unless clearly erroneous." *Id.* at 221 (citations omitted).

The Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights guarantee the right of an accused to a speedy trial.[20] *Divver v. State*, 356 Md. 379, 387-88 (1999). In *Barker v. Wingo*, 407 U.S. 514, 529-30

---

[19] Appellant did not argue below that he was denied due process of law under the Fifth Amendment by any pre-indictment delay.

[20] The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]" Similarly, Article 21 of the Declaration of Rights of the Maryland Constitution provides "[t]hat in all criminal prosecutions, every man hath a right . . . to a speedy trial by an impartial jury[.]" The Court of Appeals "considers United States Supreme Court precedents interpreting the sixth amendment to be 'very persuasive, although not necessarily controlling,' as to the proper construction of Maryland's parallel Article 21 right.'" *Divver*, 356 Md. at 387 (quoting *Stewart v. State*, 282 Md. 557, 570 (1978)) (internal quotation marks omitted).

(1972),[21] the Supreme Court established factors to be balanced to determine whether a defendant was deprived his or her right to a speedy trial. These factors include the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* at 530. None of these factors are sufficient alone to establish deprivation of the right to a speedy trial; instead, they "must be considered together with such other circumstances as may be relevant." *Id.* at 533. Courts must "engage in a difficult and sensitive balancing process" while maintaining "full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution." *Id.* We turn to our review of the *Barker* factors.

### 1. Length of Delay

The "length of delay" factor is "a term of art that serves two separate and distinct functions in a speedy trial analysis." *Ratchford v. State*, 141 Md. App. 354, 358 (2001). First, "it identifies the threshold that must be crossed before further analysis is called for[,]" marking "the minimal point" of constitutional dimension. *Id.* Unless the delay crosses the line from ordinary delay to presumptively prejudicial delay, "there is no necessity for inquiry into the other factors that go into the balance." *Barker*, 407 U.S. at 530. Once the delay triggers the four-factored analysis, we view the length of delay on its merits as a distinct inquiry. *Ratchford*, 141 Md. App. at 359-60.

"[T]he length of delay is measured from the date of arrest or filing of indictment,

---

[21]     The Court of Appeals applies the *Barker* constitutional standard when reviewing a speedy-trial challenge under Article 21. *Divver*, 356 Md. at 388.

information, or other formal charges to the date of trial." *Divver*, 356 Md. at 388-89 (citing *State v. Gee*, 298 Md. 565, 569, *cert. denied*, 467 U.S. 1244 (1984)). This case requires a more complex examination to determine which date should serve as the starting point to determine the "length of delay": November 23, 2010 (the first district court statement of charges, arrest warrant, and detainer); July 22, 2011 (the second district court statement of charges, arrest warrant, and detainer); August 31, 2011 (service of the arrest warrant); or September 29, 2011 (indictment filed).

i. November 23, 2010 Statement of Charges, Arrest Warrant, and Detainer

The circuit court determined that it would consider the delay to be the period of time from November 23, 2010 to the date the first trial began, March 19, 2012. Appellant, naturally, argues the circuit court properly used November 23, 2010—the district court's statement of charges and arrest warrant (which was never served)—as the triggering date for the speedy-trial analysis, thereby resulting in a delay of approximately 17 months. We disagree. In *State v. Gee*, the Court of Appeals established that a district court statement of charges and accompanying arrest warrant only constitute a "formal charge" in the speedy-trial context "when a defendant is subject to be tried on that document." 298 Md. 565, 574 (1984) (emphasis omitted). The Court explained that when the charges are within the district court's jurisdiction, the State is committed to and has commenced the criminal prosecution upon the issuance of the statement of charges. *Id.* "On the other hand when the defendant cannot be tried under the warrant-statement of charges he is not held to answer a criminal charge on the basis of that document" and,

therefore, it is not a "formal charge." *Id.* The Court expounded:

> Its issuance does not mark the onset of formal prosecutorial proceedings to which the Sixth Amendment guarantee is applicable, nor has the putative defendant thereby become an "accused." The State has not by the issuance of such a warrant-statement of charges committed itself to prosecute. Before it can proceed the grand jury must indict or the State's Attorney must file an information. Neither is obliged to do so. Until an indictment has been returned or an information filed the adverse positions of State and defendant have not solidified, nor is the defendant at that point faced with the prosecutorial forces of organized society and immersed in the intricacies of substantive and procedural law.

*Id.*

Here, the initial statement of charges and accompanying arrest warrant included three counts of first-degree rape, one count of kidnapping, and one count of first-degree sex offense. Pursuant to Maryland Code (1973, 2013 Repl. Vol.), Courts and Judicial Proceedings Article § 4-302(a), these crimes are felonies within the circuit court's exclusive jurisdiction. Accordingly, the State could not prosecute Appellant on those charges in the district court; instead, in order to commit to prosecution, the State would have to obtain an indictment from a grand jury or file a criminal information. *Gee*, 298 Md. at 574. Therefore, the November 23, 2010 statement of charges and mere issuance of the arrest warrant did not trigger his speedy-trial right. In addition, the record does not reflect that the arrest warrant was ever actually served, i.e. Appellant was never brought to court on these charges. Had this occurred, the arrest would have triggered his speedy trial right. *Id.* at 577.

The record does, however, reflect that a detainer was lodged pursuant to that

21

warrant and statement of charges. The Court of Appeals has opined, without deciding, that the filing of a detainer arguably could be the equivalent of an arrest: "Like an arrest, [a detainer] place[s] a restraint on [an inmate], seriously interfering with his liberty by precluding his freedom upon his release from incarceration by reason of the other convictions, and by its impact on such prison privileges he may have enjoyed" and "[i]t may be said that the detainer subject[s] him to further public obloquy, and create[s] anxiety in him, his family and his friends, as with an actual arrest." *Id.* at 577-78 (footnotes and citations omitted). Subsequently, this Court has relied on the language in *Gee* to hold that a detainer initiated the speedy-trial clock. *See Lee v. State*, 61 Md. App. 169, 177-78 *cert. denied,* 303 Md. 115 (1985).

Yet in this case, the November 23, 2010, detainer was released pursuant to the nol pros entered on April 19, 2011. We are hesitant to conclude that this detainer was the equivalent of an arrest, but because the record reflects that Appellant was up for a parole hearing around the time of the nol pros, we assume the detainer could have impacted his parole hearing. Thus, in light of *Gee* and *Lee*, we will presume that the detainer amounted to an arrest and consider whether the subsequent nol pros and consequential release of the detainer was done in good faith.

In *United States v. MacDonald*, 456 U.S. 1, 7 (1982), the Supreme Court established that "the Speedy Trial Clause has no application after the Government, acting in good faith, formally drops charges." The Supreme Court has explained that when charges are dropped,

the formerly accused is, at most, in the same position as any other subject of a criminal investigation. Certainly the knowledge of an ongoing criminal investigation will cause stress, discomfort, and perhaps a certain disruption in normal life. . . . But with no charges outstanding, personal liberty is certainly not impaired to the same degree as it is after arrest while charges are pending. . . . Following dismissal of charges, any restraint on liberty, disruption of employment, strain on financial resources, and exposure to public obloquy, stress and anxiety is no greater than it is upon anyone openly subject to a criminal investigation.

*Id.* at 8-9. In *State v. Henson*, the Court of Appeals formally recognized that the *MacDonald* good-faith standard is binding on Maryland courts and further held that "where the State terminates a prosecution in good faith, *i.e.* it does not intend to circumvent the speedy trial right, and the termination does not have that effect, the period *preceding* the earlier dismissal is not counted in the speedy trial analysis." 335 Md. 326, 338 (1994) (emphasis added).

Our courts have had several occasions to apply the *MacDonald* standard. For example, in *Lee*, *supra*, the district court issued a statement of charges and an arrest warrant on June 8, 1982, and on June 11, the court lodged a detainer. 61 Md. App. at 171. On August 5, 1982, the State filed an indictment. *Id.* Although Appellant filed a request for disposition under the IDA, no action was taken until the day trial was set to begin: March 8, 1983. *Id.* That day, the circuit court dismissed the indictment without prejudice for violation of the IDA. *Id.* According to the State, it had misplaced the defendant's request for disposition. *Id.* at 177. Two days later, on March 10, the State re-indicted the defendant. *Id.* at 171. The defendant moved to dismiss the charges for violation of his right to a speedy trial, and the circuit court denied his motion. *Id.*

23

On appeal, we recognized that the facts in *Lee* did not involve a *voluntary* dismissal like a nol pros, but nevertheless found the *MacDonald* standard as well as *Hicks* case law to be instructive.[22] We concluded that the nine-month delay from the defendant's request for disposition under the IDA to the date of trial was "not indicative of any due diligence on the part of the State." *Id.* at 176. In our view, "[t]he negligent misplacing of [the defendant's] request for disposition which caused dismissal of the indictment, although not amounting to bad faith, simply is not the same as a good faith dismissal sanctioned by the *MacDonald* court." *Id.* at 177. Looking to the first indictment period, we were ultimately persuaded that the filing of the detainer was sufficient to trigger the speedy-trial clock. *Id.* at 177-78.

In *Clark v. State*, we applied *MacDonald* and concluded that the State acted in good faith when it nol prossed the first indictment. 97 Md. App. 381, 391 (1993). We found good faith to be "apparent," because the victim and only eyewitness refused to testify, the victim issued a statement exonerating the defendant, and evidence reflected that the defendant was responsible for the witness's refusal to testify. *Id.* Accordingly, we concluded that the case "present[ed] an appropriate situation in which to apply the *MacDonald* Rule" and, therefore, looked to the second indictment to begin the speedy-trial clock. *Id.* at 393-94; *see also Collins v. State*, 192 Md. App. 192, 208, 213 (2010)

---

[22]     We recognized in *Lee*, however, that the analysis under the *Hicks* rule differs from a speedy-trial analysis, but we considered those cases to be instructive based on the facts of that case. 61 Md. App. at 174-75; *see supra* note 18.

(agreeing with the circuit court that the State acted in good faith in dismissing the original charges when the State wanted to ensure that it would be prosecuting the right person).

Here, the circuit court found that the State acted in good faith in entering the nol pros and thereby releasing the detainer,[23] and we find no error in that determination. The sole identification evidence in both cases was the DNA analysis results completed by Bode Technology ("Bode"), and Amy Baldwin, a forensic DNA analyst employed by Bode, was involved in the DNA testing in each case. Pending before the Court of Appeals at that time was a case presenting the question of whether all DNA analysts who participated in the analysis would be required to testify at trial.[24] In anticipation of this decision, the State had reason to believe that Ms. Baldwin would be an essential witness.

---

[23] Both the circuit court and the parties below discussed the State's good faith in the *Hicks* context. *See supra* footnote 18. On appeal, Appellant's briefing focused on *Curley* and its progeny based on the mistaken belief that *Hicks* and Rule 4-271 were triggered by the district court proceedings. Notably, when the Court of Appeals formally established the applicability of the *MacDonald* standard in Maryland, the Court concluded that the *MacDonald* standard is consistent with *Curley* and its progeny, noting that "there is virtue in giving a consistent construction to any time calculations required by the two rights." *Henson*, 335 Md. at 338. Therefore, because these standards are consistent, we find no substantive difference in evaluating the court's finding of good faith in the *Hicks* context as a part of our analysis in the speedy-trial context.

[24] This case was *Derr v. State*, 422 Md. 211, 237 (2011), in which the Court of Appeals ultimately held that DNA analysts who participated in the DNA testing and analysis must testify at trial in order to satisfy the Confrontation Clause. The Supreme Court granted certiorari and vacated the *Derr* decision based on its then-recent holding in *Williams v. Illinois*, 132 S. Ct. 2221 (2012) (plurality opinion). *Maryland v. Derr*, 133 S. Ct. 63, 64 (2012). On remand, in light of this decision, the Court of Appeals held that forensic evidence "must, at least be formalized, or have 'indicia of solemnity' to be testimonial" to require compliance with the Confrontation Clause. *Derr v. State*, 434 Md. 88, 115, 120 (2013).

After the State initiated charges in the district court, Bode apparently advised the State that Ms. Baldwin would be working out of the country, but did not advise where or the exact date of her return. Bode further advised that upon her return, Ms. Baldwin would only be in the United States temporarily before leaving to work on another international contract. Without Ms. Baldwin's testimony, the State was confident that it could not proceed with the prosecutions at that time and nol prossed the charges. When Ms. Baldwin did, in fact, return to the country, the State filed a new statement of charges.

The record, as the circuit court found, does not suggest that the State nol prossed the case in an attempt to undermine Appellant's right to a speedy trial; rather, it appears that the State, in exercising due diligence, believed it could not successfully proceed with prosecuting Appellant absent the testimony of Ms. Baldwin.[25] The delay between the nol pros (April 15, 2011) as well as the revocation of the detainer (April 19, 2011), and the reinstitution of charges/lodging of a detainer (July 22, 2011) was approximately three

---

[25] Appellant urges that the State had alternative options to entering a nol pros. For example, the State could have sought a postponement, but it appears that the State did not know when Ms. Baldwin would be available. *Cf. Collins*, 192 Md. App. at 209 (concluding that the State's decision to nol pros when it was unsure whether the defendant was the culprit was in good faith, even though the State could have requested a continuance instead). Or, the State could have re-conducted the DNA analysis. Although the State could have proceeded this route, it is possible that Appellant, at trial, could have impeached the second DNA analysis by establishing that a prior DNA analysis was conducted and not being presented to the jury. We are unpersuaded that failure to engage in these alternative options extinguishes the State's good faith in filing the nol pros. *Cf. Huntley*, 411 Md. at 294 n.9 (noting that where alternative options to dismissal for violation of the 180-day rule are available, like a request for a postponement, the nol pros does not have the necessary effect of circumventing the 180-day *Hicks* requirement).

26

months.  The nol pros did not have the purpose of denying Appellant a speedy trial, nor did it have the effect of doing so.  We conclude, therefore, that the November 23, 2010 statement of charges, arrest warrant, and detainer did not trigger the speedy-trial clock.

ii. The July 22, 2011 Detainer

There are three other potential "triggering" dates: the second statement of charges/filing of the detainer on July 22, 2011; the August 31, 2011 service of the arrest warrant; or the September 29, 2011 indictment.  The August 31, 2011 service of the arrest warrant certainly triggered the speedy-trial clock, but, following our decision in *Lee*, we will treat the filing of the detainer on July 22, 2011 as our operative start date. Accordingly, the delay from July 22, 2011 to Appellant's second trial on April 10, 2012 was approximately 8.5 months (8 months and 19 days).  Because this delay might be construed as presumptively prejudicial and of constitutional dimension, we will proceed to address the *Barker* factors.  *See Lloyd v. State*, 207 Md. App. 322, 329 (2012) (addressing the delay of eight months and fifteen days because the delay "might" be considered presumptively prejudicial), *cert. denied*, 430 Md. 12 (2013).

**2. Reason for Delay**

"The span of time from charging to the first scheduled trial date is necessary for the orderly administration of justice, and is accorded neutral status."  *Howell v. State*, 87 Md. App. 57, 82 (1991) (citations omitted). In the instant case, the court did not find that the period from July 2011 to trial was unusual. Indeed, after the statement of charges and detainer were issued on July 22, 2011, Appellant was served with the arrest warrant on

27

August 31, 2011. The State filed an indictment in the circuit court on September 29, 2011, and Appellant's first appearance was on October 21, 2011. A hearing was scheduled for January 6, 2011, and both parties agreed to postpone the pre-trial hearing to February 9, 2012. At that hearing, the parties scheduled Appellant's trial for the first victim in March and for the second victim in April. In our view, this sequence of events reflects the natural progression of trial preparation and is accorded neutral status.

### 3. Assertion of Speedy Trial Right

> Whether and how a defendant asserts his right is closely related to the other factors we have mentioned. . . . The more serious the deprivation, the more likely a defendant is to complain. The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right. We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial.

*Barker*, 407 U.S. at 531-32. Even if Appellant's request for action under the IDA pursuant to the first statement of charges and detainer would have constituted a request for speedy trial, he did not file another request when the second detainer was lodged. The record reflects that Appellant first asserted his right to a speedy trial by filing the motion to dismiss on April 4, 2012, six days before his second trial. We also accord this factor neutral weight.

### 4. Prejudice

"Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect":

(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.

*Barker*, 407 U.S. at 532 (footnote omitted). In the case at bar, the court found no oppressive pre-trial incarceration because Appellant was already incarcerated; that there was no specific testimony that Appellant suffered any anxiety; and, given the lack of testimony to demonstrate otherwise, that there was no impediment to Appellant's case given that the case was 30 years old. We agree that there was no oppressive pre-trial incarceration and there is no evidence in the record that Appellant suffered any additional anxiety and concern beyond that which is expected when charges are pending. Most importantly, we are unable to discern any impairment to the defendant's case. The cases underlying this appeal were cold cases, and we are of the view that any damage to Appellant's case would have resulted from the passage of time from 1979 to 2011, not from 2011 to 2012.

## 5. Balancing of the *Barker* Factors

Upon balancing the foregoing factors, we conclude that Appellant's right to a speedy trial was not violated. The 8.5-month delay from the filing of the detainer to his second trial date largely resulted from the natural progression of judicial administration, first presenting the charges to the grand jury, lodging an indictment, permitting discovery, and conducting pre-trial hearings before trial. Moreover, it was Appellant's request to have the cases relating to two different victims tried separately, and there were

no trial postponements requested by the State. Therefore, we affirm the circuit court on its denial of Appellant's motion to dismiss.

## II.

### *Right to Confrontation*

By the time the two cold cases went to trial, Jeanne Hostetler was retired, living in Arizona, and unable to travel due to a debilitating back condition. Appellant challenges the State's contention that this witness, an important link in the chain of custody of Appellant's DNA, was subject to full cross-examination during her testimony via two-way video conference, and asserts that the admission of her testimony by the court violated Appellant's Sixth Amendment right to confrontation. Appellant contends that the absence of physical face-to-face confrontation is only permitted when necessary to further an important public policy and where the testimony is otherwise reliable, and he maintains neither circumstance was present here.

The State responds that the admission of Ms. Hostetler's testimony via video conference did not violate Appellant's constitutional rights to confrontation because the testimony was a reliable, live two-way video that allowed Appellant to see Ms. Hostetler and Ms. Hostetler to see Appellant. Indeed, during the hearing before Judge McCormick and during the second trial, Appellant's counsel questioned and cross-examined Ms. Hostetler. Moreover, the State contends that permitting the two-way live video testimony in this case furthered the public policy of resolving cold cases and protecting the witness. We agree with the State.

**Skype Hearing**

On Monday March 19, 2012 at Appellant's first trial, the State advised Judge McCormick that Ms. Hostetler advised the State three days earlier, late Friday afternoon, that she could not travel to Maryland to testify due to back problems stemming from a prior vertebrae-fusion surgery. The State proposed the possibility of procuring her testimony by using Skype.[26] The next day, Judge McCormick held a hearing to examine Ms. Hostetler via Skype out of the jury's presence.[27]

Employing the Skype technology in the courtroom, the State presented Ms. Hostetler's testimony that she was a 63-year-old retired forensic serologist of the Montgomery County Policy Department and lived in Arizona. She received and intended to comply with the State's subpoena in that case and had previously traveled to Maryland to testify in other cases. She explained, however, that she was no longer able to travel because of her now-aggravated medical condition.

---

[26] Skype is a "[a] real-time video conferencing program" accessible on a computer. *Attorney Grievance Comm'n of Maryland v. Agbaje*, 438 Md. 695 (2014). The Court of Appeals has held, in the context of a civil attorney grievance case, that "allowing [a witness] to testify over real-time video conference constituted a reasonable alternative" to requiring the witness to travel to Maryland for an evidentiary hearing, which would have caused her "undue cost and hardship." *Id.* at 719. In that case, the Court found that the hearing judge imposed reasonable safeguards to protect the integrity of the witness's testimony" by requiring her to take the oath and by having her confirm that she was alone in the room. *Id.* at 720.

[27] The television used for Skype was a 42-inch flat screen. The video testimony of this hearing and the hearing before Judge Greenberg on the use of WebEx are contained in the record.

Ms. Hostetler explained that she had surgery in January 2011 to fuse two of her vertebras in an effort to relieve a multilevel cervical radiculopathy.[28] One month prior to trial, however, she began having extreme pain and numbing of the arms caused by nerve irritation. She testified that this pain and numbing was exacerbated during her last flight to Maryland for a trial in February 2012, and that the numbing of her arms causes damage to her spinal column and her nerves. She stated that she would probably face another surgery. Notably, her treating neurologist provided her an "order requisition" dated March 16, 2012, which was admitted into evidence, stating that that Ms. Hostetler "is not cleared from a medical neurosurgical standpoint for flying or traveling." It was Ms. Hostetler's understanding that her doctor gave her this order to avoid the possibility of further nerve damage. Defense counsel cross-examined Ms. Hostetler via the two-way Skype video conference, prompting her to relate that she only drives locally about once or so a week. After hearing argument from counsel, Judge McCormick found Ms. Hostetler's testimony to be credible and that it would be "cruel and unnecessary to require her to fly here." Judge McCormick therefore permitted Ms. Hostetler to testify at trial via Skype.

**WebEx Hearing**

On April 10, 2012, before Appellant's second trial, Judge Greenberg held a

---

[28]     "Radiculopathy" is a "[d]isorder of the spinal nerve roots." Stedman's Medical Dictionary 1622 (28th ed. 2006).

hearing to examine Ms. Hostetler via WebEx.[29] Ms. Hostetler testified that her nerve damage and medical condition had not changed or improved since the last hearing. Judge Greenberg stated that he had listened to the entire proceeding held before Judge McCormick. Judge Greenberg observed that but for scheduling issues, Judge McCormick would have kept the case, and the matter would not have been re-litigated. Nevertheless, after hearing from both parties, Judge Greenberg found that nothing had changed for Ms. Hostetler medically, and he agreed with Judge McCormick's decision. He concluded that the witness was reliable and that there were important public policy considerations of "justly resolving criminal cases while protecting the well being of the witnesses" and resolving cold cases based on advances in science and technology. Therefore, Judge Greenberg determined that Ms. Hostetler's testimony did not violate Appellant's right to confrontation. As a safeguard, however, Judge Greenberg advised that if serious technological problems were to arise during trial, he would revisit his decision.

**Amendment VI**

The Sixth Amendment to the United States Constitution, applicable to the State of Maryland through the Fourteenth Amendment, establishes that "[i]n all criminal

---

[29] Similar to Skype, WebEx is a web-based tool that permits parties in separate locations to engage in a real-time video conference.

prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI.[30]  The Confrontation Clause

> (1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth'; [and] (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.

*California v. Green*, 399 U.S. 149, 158 (1970) (footnote omitted). Together, these "elements of confrontation" serve to safeguard "that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings." *Maryland v. Craig*, 497 U.S. 836, 846 (1990) (citations omitted). To this end, Supreme Court precedent establishes that the Confrontation Clause reflects a "preference" for physical face-to-face confrontation, not

---

[30]    Similarly, Article 21 of the Maryland Declaration of Rights provides that "in all criminal prosecutions, every man hath a right . . . to be confronted with the witnesses against him . . . [and] to examine the witnesses for and against him on oath[.]" Our Courts analyze a confrontation challenge under Article 21 *in pari materia* with the Sixth Amendment right to confrontation.  *Cooper v. State*, 434 Md. 209, 232 (2013) (citations omitted), *cert. denied*, 134 S. Ct. 2723 (2014).  Moreover, when construing the right to confrontation in the context of using a one-way video conference medium in lieu of physical, in-court testimony, the Court of Appeals, on remand following the Supreme Court's decision in *Craig,* held that it would not construe the Confrontation Clause of Article 21 differently from the Supreme Court's construction of the Confrontation Clause of the Sixth Amendment. *Craig v. State*, 322 Md. 418, 430 (1991).

an absolute guarantee.[31]  *Id.* at 849; *see also Coy v. Iowa*, 487 U.S. 1012, 1019 (1988) ("It

is always more difficult to tell a lie about a person 'to his face' than 'behind his back.'").

The seminal Supreme Court case on the use of a video medium in lieu of physical

confrontation is *Maryland v. Craig*, 497 U.S. 836 (1990).[32]  In *Craig*, the Court addressed

---

[31]    Otherwise, hearsay exceptions, for example, would be virtually abrogated by a literal reading of the Confrontation Clause.  *Craig*, 497 U.S. at 848 (citing *Ohio v. Roberts*, 448 U.S. 56, 63 (1980)); *see also Crawford v. Washington*, 541 U.S. 36, 55-69 (2004) (abrogating the reasoning of *Ohio v. Roberts* by holding that out-of-court statements by witnesses that are testimonial are barred under the Confrontation Clause unless witnesses are unavailable and the defendant had a prior opportunity to cross-examine the witnesses, regardless of whether such statements are deemed reliable by court).

[32]    The Maryland Rules do not address the use of video conferencing in criminal trials.  There are, however, several rules that address video conferencing in other proceedings.  For instance, a defendant is permitted to appear via two-way video conference at an initial appearance before a district court—so long as the chief judge thereof has approved the use of video conferencing in that county—instead of appearing in person in court.  Rule 4-231(d).  The Committee Note to this Rule provides, however, that "[b]y the addition of section (d) to the Rule, the Committee intends no inference concerning the use of video conferencing in other contexts."  The Rules also provide that video conferencing may be appropriate in the habeas corpus context "[i]f, pursuant to an isolation or quarantine directive or order issued under any federal, State, or local public health law or public emergency law, one or more of the parties, their counsel, or witnesses are unable to appear personally at the hearing, and the fair and effective adjudication of the proceedings permits[.]"  Rule 15-309(b) (requiring a judge to immediately inquire into the legality of an individual's confinement); *see also* Rule 15-306.
The Rules also address video conferencing in the civil context.  For example, in the context of judicial review of an administrative agency decision, Rule 7-208(c) permits a court, on motion or its own initiative, to "allow one or more parties or attorneys to participate in a hearing by video conferencing or other electronic means[,]" but if it does so on its own initiative, the court must give notice to the parties and afford them a reasonable opportunity to object.  In rendering this decision, the court must consider the availability and sufficiency of equipment; whether physical presence is particularly
(continued . . . )

the constitutionality of a procedure permitted by a Maryland statute that allowed a child victim to testify via a one-way closed circuit television instead of appearing in court.[33] This mechanism allowed those in the courtroom to observe the child as he or she testified and was cross-examined in a separate room; the child, however, could not see the defendant. *Id.* at 841. The defendant was still able to communicate with his defense counsel during cross-examination. *Id.* at 842. After reviewing the history and purpose of the Confrontation Clause, the Court held that "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Id.* at 850 (citations omitted).

Based on the facts before it, the Court first concluded that the testimony provided via the one-way circuit television was reliable, because it afforded elements of confrontation—oath, cross-examination, and observation of the witness's demeanor— that "adequately ensure[d] that the testimony is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person

important in the context of the issues presented in that case; whether physical presence could only occur at significant cost or inconvenience; whether the lack of physical presence of some of the parties would be unfair; and any other factors the court deems relevant. Rule 7-208(c)(1)(A)-(E).

[33]    This statute still exists today. *See* CP § 11-303. The statute prohibits the use of two-way closed circuit television, as the use thereof would avoid the purpose of the rule: to permit the child to testify without seeing or hearing the defendant.

testimony." *Id.* at 851. Next, the Court held that "if the State makes an adequate showing of necessity, the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant." *Id.* at 855. The Court explained that the "requisite finding of necessity must . . . be a case-specific one: The trial court must hear evidence and determine whether use of the one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify[,]" such that the child would be traumatized by the presence of the defendant and that the emotional distress to be suffered is more than de minimus. *Id.* at 855-56.

We deem two-way video testimony, although it provides some additional confrontation assurances than one-way video testimony does, nevertheless to fall short of providing the same guarantees as physical, in-court testimony.[34] Even the most cutting-edge technology cannot wholly replace the weight of in-court testimony, for the electronic delivery of that testimony—no matter how clearly depicted and crisply

---

[34] The parties did not brief whether the principles espoused in *Craig*, involving a one-way video system, should also apply when a two-way video system is involved, and the Supreme Court has not yet addressed this issue. It appears, however, that most jurisdictions apply *Craig* to determine the constitutionality of two-way video systems as well as one-way video systems. *See, e.g., State v. Rogerson*, 855 N.W.2d 495, 502-03 (2014) (cataloguing and discussing decisions from many jurisdictions and concluding that all surveyed jurisdictions, except one, applied the *Craig* analysis to both one-way and two-way video systems).

heard—is isolated from the solemn atmosphere of the courtroom and compromises human connection to emotions like fear, apprehension, or confusion. Accordingly, we hold that the *Craig* standard applies when the State seeks to present witness testimony via two-way video conference against a defendant in a criminal proceeding. And, the issues this Court must resolve pursuant to the standard set forth in *Craig* are whether Ms. Hostetler's testimony via a two-way medium was reliable; whether the denial of Appellant's right to confront her in person furthered an important public policy; and whether the court made a sufficient finding of necessity. We "apply the *de novo* standard of review to the issue of whether the Confrontation Clause was violated in this case." *Snowden v. State*, 156 Md. App. 139, 143 n.4 (2004) (citing *Bond v. State,* 142 Md. App. 219, 227 (2002)), *aff'd,* 385 Md. 64 (2005); *accord Langley v. State*, 421 Md. 560, 567 (2011).

A. <u>Reliability of Two-Way Video Conference Procedure</u>

At Appellant's first trial, the State presented Ms. Hostetler's testimony via Skype, and at his second trial, the State used WebEx. Both methods preserved hallmarks of the confrontation right aside from physical, in-court testimony: Ms. Hostetler was sworn under oath; Appellant, counsel, the court, and the jury could see Ms. Hostetler and observe her demeanor; and Ms. Hostetler was available for contemporaneous cross-examination. Moreover, unlike the one-way television in *Craig*, Ms. Hostetler was able to see Appellant. Both two-way mediums—absent any technological complications— therefore provided the traditional indicia of reliability under the Confrontation Clause.

38

On that point, Appellant challenges the efficacy of Skype and WebEx at both trials. As to the first trial, Appellant highlights the difficulty the State experienced in establishing a two-way connection when it first called Ms. Hostetler to testify, prompting the State to move on to another witness. Although the State did, indeed, experience some troubleshooting issues, the testimony proceeded without issue once the connection was ultimately established when Ms. Hostetler was recalled.

Appellant highlights on appeal the pixelated, dark picture during the Skype testimony. As found by Judge McCormick at the hearing, "the Court has had an opportunity to watch this feed live from this witness, and while the focus isn't as perfect as you would like for your wedding pictures, you could still see this women responding to every question. Sometimes her, the fine details were fuzzy, but you could see her lips moving in response to what was being said . . . [and] [y]ou can see her face."[35] Significantly, the record does not reflect that Appellant's counsel objected during the hearing or during the trial to the quality of the Skype image. Appellant's counsel cross-examined Ms. Hostetler during the hearing but chose not to cross-examine her during the trial. In fact, Appellant sought to call Ms. Hostetler as a defense witness to testify as to

---

[35] Our record contains a DVD video recording of the Skype video testimony, taken with a Canon video camera situated slightly below the flat-screen television and angled slightly upward. Keeping in mind that the television screen may have appeared differently to those in the courtroom than as represented in the recording, our independent viewing of the DVD suggests that the Skype video's lighting conditions were perhaps less than ideal, but as observed by Judge McCormick, Ms. Hostetler's facial features and expressions were still visibly discernable during her brief testimony.

the substance of her analysis, but after a few questions on direct, defense counsel conferred with the State and her report was moved into evidence instead. Based on our review of the record, therefore, we do not find the court erred in finding that the Skype connection and image quality preserved the confrontation element of observing the witness's demeanor.

With respect to the second trial, Appellant emphasizes Ms. Hostetler's initial difficulty—out of the jury's presence—hearing those in the courtroom and Judge Greenberg's corresponding concerns. Yet, once the audio problem was resolved, the testimony proceeded without issue. The State also took precaution to ensure that Ms. Hostetler could hear, advising her at the outset of direct examination to notify the court immediately if there ever came a time at which she was no longer able to hear. During Ms. Hostetler's testimony, Appellant's counsel did not object to the quality of the WebEx audio or image. Therefore, we are convinced that the WebEx connection preserved the confrontation element of observing the witness's demeanor.

B. <u>Important Public Policy and Adequate Finding of Necessity</u>

As noted *supra*, a defendant's right to confront his adversaries, absent physical appearance, may nevertheless be satisfied if the denial of physical confrontation due to unavailability furthers an important public policy. *Craig,* 497 U.S. at 850. Appellant argues that convenience and efficiency are not sufficiently important public policies to warrant dispensing the right to physical face-to-face confrontation, and we agree. For instance, in *United States v. Yates*, 438 F.3d 1307 (11th Cir. 2006) (en banc), a case on

which Appellant relies, two essential witnesses resided in Australia, thereby beyond the government's subpoena power, and were unwilling to travel to the United States for trial. *Id.* at 1310. The defendant objected to the use of two-way video conference broadcast. The district court applied the principles set forth in *Craig* and ultimately permitted both witnesses to testify. *Id.* at 1315. On appeal, the Eleventh Circuit vacated the defendants' convictions. According to this Circuit, the Government's policies of providing the fact-finder with crucial testimony and its need to expeditiously resolve that case were "not the type of public policies that are important enough to outweigh the Defendants' rights to confront their accusers face-to-face." *Id.* at 1316.

Where considerations beyond mere convenience and expedience are involved, however, the factual setting of a case may support a finding of necessity to justify the absence of a witness's physical presence at trial. Other jurisdictions, for example, have found the need to protect the well-being of a medically infirm witness to be an important public policy under *Craig*. In *New York v. Wrotten*, the defendant was charged with first-degree assault and two counts of first-degree robbery. 923 N.E.2d 1099, 1100 (N.Y. 2009), *cert denied*, 560 U.S. 959 (2010). Soon after the incident, the elderly complainant moved to California. *Id.* at 1101. Before trial, the State requested that the complainant be permitted to testify via two-way video conferencing, and at a hearing held thereafter, both the State and the defendant presented expert medical testimony regarding the complainant's condition. *Id.* Crediting the State's experts, the court found that the complainant was, at the time, a frail 85-year-old with a history of coronary disease and

41

held that he could not travel to New York without endangering his health. *Id.* The court permitted the complainant to testify via a two-way video conference at trial, and the defendant was ultimately convicted of second-degree assault. *Id.* On appeal, the Court of Appeals of New York held that under *Craig*, the two-way video conference preserved "[all] traditional indicia of reliability" and that "the public policy of justly resolving criminal cases while at the same time protecting the well-being of a witness can require live two-way video testimony in the rare case where a key witness cannot physically travel to court in New York and where, as here, defendant's confrontation rights have been minimally impaired." *Id.* at 1103.

Similarly, in *Bush v. State*, the defendant was charged with first-degree murder of his wife, and on the eighth day of his trial, the State requested the court's permission to call, via video conference, a witness who, a week before, had suffered congestive heart failure and was therefore unable to travel to Wyoming from Colorado. 193 P.3d 203, 214 (Wyo. 2008), *cert. denied,* 556 U.S. 1185 (2009). The court initially denied the request, but later revised its decision in light of its subsequent review of the witness's medical records and the physician's advice not to travel to Wyoming. *Id.* at 215. On appeal, the Supreme Court of Wyoming concluded, after applying the *Craig* standard, that the trial court did not err in granting the request because the witness's "testimony via video conference was necessary to further the important public policy of preventing further harm to his already serious medical condition." *Id.* at 215-16.

Other courts, both state and federal, have permitted or found no error in two-way video conferencing where the witness's health prevented face-to-face testimony. *See, e.g.*, *Horn v. Quarterman*, 508 F.3d 306, 317 (5th Cir. 2007) (concluding, on appeal from a federal habeas petition, that the state court did not unreasonably apply federal law when it permitted a terminally ill witness, whose doctor advised against travel, to testify via a two-way closed circuit television); *Harrell v. Butterworth*, 251 F.3d 926, 931 (11th Cir. 2001) (holding, in the context of a federal habeas petition, that the state court's conclusion that an important public policy to excuse in-person confrontation was not contrary to federal law when "the witnesses lived beyond the subpoena power of the court"; that it was in the state's interest "to expeditiously and justly resolve criminal matters that are pending in the state court system"; that one of the witnesses was in poor health and could not travel from Argentina to the United States; and that the two witnesses were "absolutely essential" to the case"), *cert. denied*, 535 U.S. 958 (2002); *State v. Sewell*, 595 N.W.2d 207, 211-13 (Minn. Ct. App. 1999) (affirming the trial court's authorization of live testimony via interactive television when the witness had undergone surgery and his physician, via affidavit and telephone contact, informed the court that the witness would risk paralysis if he traveled to Minnesota); *Stevens v. State*, 234 S.W.3d 748, 781-83 (Tex. Ct. App. 2007) (affirming the trial court's authorization of two-way, closed-circuit television where the 75-year-old witness had a tenuous health situation that was documented by letters from his treating cardiologist). *Cf. United States v. Gigante*, 166 F.3d 75, 79 (2d Cir. 1999) (affirming the district court's authorization of

43

a witness who was fatally ill with cancer and whose doctor advised against travel to testify via video conference by applying the "exceptional circumstances" standard encompassed by Rule 15 of the Federal Rules of Criminal Procedure (governing depositions) instead of the *Craig* test).

We are persuaded that the combined public policy justifications of resolving cold cases and simultaneously protecting the physical well-being of a significant witness are sufficient under *Craig* to warrant the absence of Ms. Hostetler's in-court testimony in this case. This was not a case in which the witness was merely unwilling to travel, as in *Yates*; in fact, she had flown back to Maryland to testify in other cases and had intended to comply with the subpoena she received for this case. It was not until the earlier flight exacerbated her nerve condition that she could not—pursuant to her doctor's order—return to Maryland for Appellant's trials.

The resolution of cold cases inevitably spawns numerous procedural barriers, including missing witnesses like those who suffer from debilitating medical conditions preventing physical appearance at trial. We emphatically caution, however, that the State must demonstrate necessity—not simply convenience or expediency—in order to deny a defendant his right to physically confront his adversaries in a court of law. "[F]ace-to-face confrontation is not an absolute constitutional requirement[;] it may be abridged only where there is a 'case-specific finding of necessity.'" *Craig v. State*, 322 Md. at 423 (internal quotation marks and citations omitted). Accordingly, a court must render an

44

adequate, case-specific finding based on the evidence presented that the two-way video conference is necessary to further the identified public policy.

Here, the State presented evidence in the form of Ms. Hostetler's testimony and an "order requisition" from her treating neurologist. At a hearing out of the jury's presence during the first trial, Judge McCormick heard testimony from Ms. Hostetler on Skype regarding her medical condition, reviewed her doctor's order against flying/travelling, and found as follows:

> [Ms. Hostetler] has given us this history of having cervical problems and having surgery at one level, hoping that that would fix the problem, and that having problems subsequent to the surgery to the point where she and her doctor are considering a second surgery. . . . She's credible. I don't have any other evidence to the contrary to require her to fly. We have her doctor's note. I note, according to the doctor's order requisition, that she's 63 years old, she lives in Arizona, as [does] her doctor, and her doctor hasn't cleared her. She's given a history that, at the end of February, she did fly out here, which was a five-hour trip and that, after or as soon as she got to Maryland, she was experiencing exacerbation. She told us, and there's no reason to feel otherwise, that she is very concerned that there would be further nerve damage if she were to do something to exacerbate it further, and I think that her concerns are reasonable.

> \*      \*      \*

> [T]o require her to testify live, when we have the option of this Skype procedure or technology, would be wrong under th[is] set of circumstances. She is unavailable, and **I think it cruel and unnecessary to require her to fly** here given that we have the technology available to us, given the nature of her proposed testimony; **but the bottom line is, she can't fly, her doctors haven't cleared her to fly, and she understands it loud and clear that she could possibly have further nerve damage**.

(Emphasis added).

At a hearing before the second trial, Judge Greenberg recognized that had Judge

45

McCormick kept the case, the ruling would have been the same,[36] but nevertheless reviewed the facts of the case. He held a hearing during which Ms. Hostetler testified via WebEx and he found:

> There's nothing that I've heard that leads me to believe that anything has changed for her medically and that yes, I suppose it would be physically possible for her to come here, but not without putting herself at a great deal of pain and perhaps risk because the uncontradicted testimony that Judge McCormick credited was that these periods which she has numbness come without warning. She could be driving an automobile and her arms could go numb. So in a sense, it puts the witness at some danger as well.
>
> *     *     *
>
> Now, I've been pointed to no authority, and perhaps it exists, and I don't know of it, that would require me to get medical evidence before I could say somebody was medically not able to be here. But the point is, I do have such evidence. Granted, it is not as detailed as it could be if we had the doctor here. But I agree with Judge McCormick[.]

These findings were case-specific and based on competent evidence.[37]

Although it cannot be said that the observations of a chain of custody witness's demeanor during testimony is of the same caliber of importance as observations of a testifying victim's demeanor, we note that in the instant case Ms. Hostetler was nevertheless a material witness in the chain of custody for the forensic evidence in both cases. Therefore, we reject the State's contention that if there was any error in allowing

---

[36]     Appellant does not challenge Judge Greenberg's reliance on Judge McCormick's findings. In any event, Judge Greenberg proceeded to review the evidence and make independent determinations.

[37]     We note, however, that it may be better practice to present the doctor's testimony or an affidavit explaining how the medical condition at issue precludes travel.

46

her to testify via videoconference, such error would have been harmless. She received the forensic evidence in both cases, unsealed the evidence, physically took cuttings to conduct a serology analysis, and then resealed the evidence. Both cases on appeal were cold cases re-opened after the passage of three decades, and the identification evidence was premised almost solely on the DNA testing results of that forensic evidence. Who collected the evidence, who touched the evidence, how/where the evidence was stored, and in what condition, was of particular importance in this context in establishing a reasonable probability that no tampering of the evidence occurred, especially in Appellant's second trial where the clothing was not contained with the rest of the evidence. *See Cooper v. State*, 434 Md. 209, 227 (2013) ("When determining whether a proper chain of custody has been established courts examine whether there is a 'reasonable probability that no tampering occurred.'" (quoting *Breeding v. State,* 220 Md. 193, 199 (1959))), *cert. denied,* 134 S. Ct. 2723 (2014); *Wagner v. State*, 160 Md. App. 531, 552 (2005) ("Establishing a 'chain of custody' as to a certain item provides a means to 'account for its handling from the time it was seized until it is offered in evidence.'" (quoting *Lester v. State,* 82 Md. App. 391, 394 (1990))).

In sum, although Ms. Hostetler was an important witness, we conclude that under the principles espoused in *Craig*, the Skype and WebEx two-way video conferences reliably preserved all elements of confrontation aside from physical, in-court testimony; that the denial of Appellant's right to face-to-face confrontation was permissible under the important public policies of resolving cold cases and protecting the medical well-

being of a witness; and that the courts made adequate, case-specific findings of necessity. We find no denial of Appellant's right to confrontation.

## III.

### *Closing Argument*

Appellant argues that Judge Greenberg erred in permitting the prosecutor to make improper and prejudicial statements during closing argument. Specifically, Appellant challenges the prosecutor's statements that defense counsel wanted to cloud the issues for the jury and that defense counsel only asserted, but failed to identify, any errors in the State's DNA experts' analysis on the ground that this shifted the burden of proof. The State counters that this objection was not preserved and, even if it was, the statements were not prejudicial and it would be within the circuit court's discretion to permit them.

The State is correct that Appellant did not object to these statements during closing argument. Nor does Appellant acknowledge the lack of preservation in his briefing or request plain error review. Maryland Rule 8-131(a) provides, in pertinent part:

> Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal.

The power to decide issues not raised below is "solely within the court's discretion and is in no way mandatory." *Conyers v. State*, 354 Md. 132, 148 (citing *State v. Bell*, 334 Md.

178, 187-88 (1994)), *cert. denied*, 528 U.S. 910 (1999). The Court of Appeals has explained:

> [T]he main purpose of Md. Rule 8-131(a) is to make sure that all parties in a case are accorded fair treatment, and also to encourage the orderly administration of the law. Toward that end, we stated in *Bell*: "The interests of fairness are furthered by 'requir[ing] counsel to bring the position of their client to the attention of the lower court at the trial so that the trial court can pass upon, and possibly correct any errors in the proceedings.'"

*Id.* at 148-49 (internal citations omitted). "Reviewing an unpreserved issue is even more tenuous when the defendant fails to object at trial, and then, on appeal, fails to acknowledge the lack of objection or ask this Court to review for plain error." *Warren v. State*, 205 Md. App. 93, 126 n.9 (2012) (citing *Garner v. State,* 183 Md. App. 122, 151-52 (2008), *aff'd,* 414 Md. 372 (2010)). Here, Appellant has failed to acknowledge that the issue is not preserved. Moreover, not only does Appellant not set forth arguments as to plain error, he failed to even request it. The review of the unpreserved objection to statements made during the State's closing argument would not serve either purpose of guiding the circuit court or avoiding another appeal, nor do we see any deprivation of a fair trial based on these statements—we decline to review this unpreserved issue.[38]

---

[38] And even if we did review this objection, we would not find plain error. Maryland courts have "characterized instances when an appellate court should take cognizance of unobjected to error as compelling, extraordinary, exceptional or fundamental to assure the defendant a fair trial." *State v. Hutchinson*, 287 Md. 198, 203 (1980). "[A]ppellate review under the plain error doctrine '1) always has been, 2) still is, and 3) will continue to be a rare, rare phenomenon.'" *Hammersla v. State,* 184 Md. App. 295, 306 (quoting *Morris v. State*, 153 Md. App. 480, 507 (2003), *cert. denied,* 380 Md. (continued . . .)

**JUDGMENTS AFFIRMED;
COSTS TO BE PAID BY APPELLANT.**

---

618 (2004))), *cert. denied,* 409 Md. 49 (2009). Thus, even if we would have concluded that the statements were improper had the objections been preserved, we would only afford Appellant review under plain error had those statements denied Appellant his fundamental right to a fair trial. That extraordinary remedy is not warranted here.